PER CURIAM.
Corey Allen Wimbley was indicted for one count of murder made capital pursuant to § 13A-5-40(a)(2), Ala.Code 1975, for killing Connie Ray Wheat during the course of a robbery and one count of murder made capital pursuant to § 13A-5-40(a)(9), Ala.Code 1975, for killing Wheat during the course of an arson.
At the conclusion of the guilt phase of the trial, the jury unanimously found Wim-bley guilty of both counts, and, following the presentation of evidence during the penalty phase of the trial, it recommended by a vote of 11-1 that he be sentenced to death for count one and by a vote of 10-2 that he be sentenced to death for count two.

Facts

On the morning of December 19, 2008, Wheat was working alone at the Harris Grocery store, which he owned, in Wagar-ville. Two women, one of whom was a longtime friend of Wimbley’s, were driving by Harris Grocery when they saw Wim-bley run out of the store and get into an automobile driven by Juan Crayton, III. A short time later, a customer walked into Harris Grocery to make a purchase. She smelled gasoline and saw liquid on the floor but was unable to locate Wheat. Other customers came into the store, and one of them, T.J. Smith, walked behind the counter of the store, where he found Wheat dead on the floor. Smith went outside and telephoned emergency 911.
Alabama State Trooper Robert Knapp was driving by Harris Grocery and saw several people in the parking lot gesturing at him. Trooper Knapp pulled into the parking lot of Harris Grocery and entered the store. He smelled gasoline and saw liquid on the floor and the counter. After looking at Wheat’s body, Trooper Knapp secured the store and contacted his dispatcher, asking for additional law-enforcement officers to be sent to Harris Grocery.
Crayton drove himself and Wimbley to the home of Earnest Lee Barnes in Mobile. After speaking outside to the two men, Barnes went alone into his house. When Barnes came out, he noticed that Crayton had moved Crayton’s car from a concrete slab to a muddy area on the side of Barnes’s house. The three men then got into Barnes’s car and drove to a mall. Barnes stopped at a service station and, while pumping gasoline into his car, received a telephone call from his cousin, who told him that Wimbley and Crayton had “just done something bad up there in Courtelyou.”[1] (R. 731.) Barnes took the two men back to his house, where Crayton and Wimbley argued about who would drive Crayton’s car. Crayton decided that he would drive the car, and Wimbley asked Barnes to drive him to the Greyhound bus station. Barnes drove Wimbley to the bus station, where Wimbley got his suitcase out of Barnes’s car, went inside the station, and bought a bus ticket to Tampa, Florida.
Barnes telephoned his cousin, with whom he had spoken at the service station, and his cousin told him that Wimbley and Crayton had killed someone. Barnes then went to the McIntosh Police Department to report his contact with Wimbley and Crayton.
Wimbley went into a bathroom at the bus station and changed his clothes. Later that day, he was arrested at the bus station and transported to the Washington County jail.
*193 Crayton abandoned his car at a service station in Mobile. Inside the car, officers conducting a search pursuant to a search warrant found a box of matches and a pair of work gloves.
Inside Harris Grocery, law-enforcement officers found the bullets that had passed through Wheat’s body. Officers also noticed a red liquid on the counter and saw that the liquid had been “slung across the floor.” (R. 683.) Officers found struck matches and noticed that one area of the floor was charred and that there was a “small amount of charring on the counter by the register.” (R. 811.) Outside the store, officers found a plastic bottle containing residue.
Barnes gave officers permission to search his property. In Barnes’s backyard, officers found Wheat’s driver’s license, Social Security card, and bank cards.
Officers recovered Wimbley’s suitcase from the bus station and searched it pursuant to a search warrant. The officers found $325 in assorted United States currency inside the pocket of a pair of shorts in the suitcase.
After Wimbley was arrested, he invoked his right to counsel. Thereafter, on December 23, 2008, Wimbley requested to speak with members of the Washington County. Sheriffs Office. .Deputy Ferrell Grimes went to the jail where he reviewed a Miranda[2] form with Wimbley before Wimbley signed it. During the interview that followed, Wimbley first told Deputy Grimes that, on the day of the murder, he had asked Crayton to take him to Mobile. Crayton .and another man Wimbley knew only as “Peanut” had picked up Wimbley and the three had gone to Creóla where Crayton let Peanut out of the car. Cray-ton and Wimbley then had gone to Baines’s house. After Deputy Grimes told Wimbley that witnesses had seen him leaving the Harris Grocery after the shooting and that Crayton had talked, with law enforcement, Wimbley said that Crayton had picked him up the morning of the robbery and murder and had given Wimbley words of encouragement. Wimbley told Deputy Grimes that before Crayton picked him up that day, Wimbley had mixed gasoline with á Fánta soft drink in a bottle. Wimbley stated that he took the bottle into Hárris Grocery, shot Wheat, stole cash, and then poured the mixture in the bottle throughout the store. Wimbley also said that he first shot Wheat in the arm and that he had poured the gasoline mixture on Wheat after he hail shot him.
In January 2009, officers again searched Barnes’s house. In a shed in the backyard, officers found a .38 caliber handgun, a compact disc case, and some United States currency.
Dr. John Krolikowski, a senior medical examiner with the Alabama Department of Forensic Sciences, conducted the autopsy on Wheat. Dr. Krolikowski concluded that Wheat had been shot three times. One bullet struck^ Wheat in his right arm and shoulder before exiting his back. Another bullet entered the right side of Wheat’s chest, traveled through his heart, and exited the left side of his chest. The third bullet entered Wheat’s back and exited his chest. The cause of Wheat’s death was multiple gunshot wounds, and the manner of his death was homicide.
Timothy McSpadden, a firearm and tool-mark examiner with the Alabama Department of Forensic Sciences, determined that the bullets recovered from Harris Grocery had been fired from the .38 caliber handgun found in the shed at Barnes’s house.
*194 Gary Cartee, a Deputy State Fire 'Marshal with the State Fire Marshal’s Office, determined that the fire inside Harris Grocery was intentionally set and that the cause of the fire was the “introduction of ignitable liquids onto the scene, set by an open ñamé, a match.” ■ (R. 799.)
Sharee Wells, a forensic scientist with the Alabama Department of Forensic Sciences, analyzed samples of liquids taken from Harris Grocery and the clothes Wheat was wearing when he was shot. Wells detected gasoline on the pair of pants and shirt Wheat was wearing when he was shot. She also determined that liquid found on the counter, floor, and a shelf inside Harris Grocery and liquid taken from the plastic bottle found in the parking lot of Harris Grocery was gasoline.
The Federal Bureau of Investigation determined that one of the shoes Wimbley was wearing at the time of his arrest matched a shoe print officers found on a paper bag behind the counter at Harris Grocery.

Standard of Review

In addition to the standards of review applicable to preserved allegations' of errors, because Wimbley was sentenced to death, Rule 45A, Ala. R.App. P., requires that this Court search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or hot brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:'
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s '‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain eiTor exists only if failure to récog-nize the error would ‘seriously affect the fairness or integrity of the judiciál proceedings,’ and' that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks' emitted)).”
11 So.3d at 938.. “The standard, of review in reyiewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly *195 raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113,121 (Ala.Crim.App.1999). Although Wimbley’s failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991).
I.
On appeal, Wimbley first argues that the circuit court abused its discretion by denying his motion-to suppress the statement he gave to law-enforcement officers. Specifically, Wimbley argues that, his statement should have been suppressed for the following reasons: 1) it was obtained after he had invoked his right 'to counsel- in violation, of the holding of the Supreme Court of the United States in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); 2) it was obtained without a valid waiver, of his rights under. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and 3) it was coerced by his placement in solitary.confinement and a promise that he would, be moved to general population if he confessed.
Initially, this Court notes:
“ ‘ ‘When evidence is presented ore ten-us to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); “[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,” Bradley v. State, 494 So.2d 750, 761 (Aa.Crim.App.1985), aff'd, 494 So.2d 772 (Aa.1986); and we make “ ‘all the reasonable inferences and credibility choices supportive of the decision of the trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761. “[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court..:. Absent a gross abuse of discretion, a trial court’s resolution- of [such] conflict[s] should not be reversed on appeal.” Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993). (citations omitted). However, “ ‘[w]here the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the [appellate] Court will sit in judgment on the evidence de novo, indulging.no presumption in favor of the trial court’s application of the law to those facts.’ ” State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980). ‘““[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.” ’ ” Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004), quoting Hill, 690 So.2d at 1203, quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995). A trial court’s ultimate legal conclusion on' a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. See State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000).’ ”
C.B.D. v. State, 90 So.3d 227, 237 (Ala.Crim.App.2011) (quoting State v. Hargett, 935 So.2d 1200, 1203-64 (Aa.Crim.App.2005)). “ ““ “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based, his decision.” ”” ” Byrd v. State, 78 So.3d 445, 450-51 (Ala.Crim.App.2009) (quoting Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005), quoting in turn State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996), quoting in turn Dowdy v. Gilbert Eng’g' Co., 372 So.2d 11, 12 (Ala.1979), quoting in turn Premium Serv. Corp. v. Sperry & Hutchinson Co., 511 F.2d 225 (9th Cir.1975)). “This Court will not weigh *196 the evidence and set aside a judgment merely because the trial judge could have drawn different inferences or conclusions .... ” Strickland v. Markos, 566 So.2d 229, 236 (Ala.1990). Rather, “ ‘[i]n reviewing the correctness of the trial court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive’ of the decision of the trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993) (quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985)).
The record establishes that Wimbley was arrested on December 19, 2008. Wimbley was placed in solitary confinement because of the ongoing investigation into Wheat’s murder. At some point after his arrest, Wimbley spoke with law-enforcement officers and invoked his right to counsel. Thereafter, on December 23, Wimbley asked a jailer for permission to speak with law-enforcement officers. Deputy Ferrell Grimes with the Washington County Sheriffs Office and Donald Lolley with the District Attorney’s Office met with Wimbley in the Washington County courthouse.
Deputy Grimes asked Wimbley: “Did you request to talk to us again?” (C. 553.) Wimbley replied:
“Yes, Sir, on one condition. I can’t take it up in the hole. They said I whs, I was a threat to, to the population but I’m not no threat. I told them I will tell them everything I know if they will take me to general population, I’ll sleep on the floor. It’s dark in there, the water don’t work, just move me to general population.”[3]
(State’s exhibit 56.) Thereafter, Deputy Grimes stated:
‘Well, if, if you don’t (inaudible) tell us everything you know we want the truth now.... We know the truth. We know, we’ve got ... Juan. And he’s in, over at Clark County. And he’s done told us the whole deal.... So. We know the story and we don’t want you lying to. us if you’re going to talk to us. You under-. stand?”
(C. 553.) Wimbley responded that he understood. Then, Deputy Grimes explained a rights-waiver form as follows:
“Alright. I’m going to have to read you your rights again, since you requested a lawyer the other day. Ok? Alright. Alright. You know you’ve been charged with capital murder-with (Inaudible) in Washington County on December 19th of 2008. The first is you -have the right to remain silent you don’t have to make any statement at all, do you understand that? That anything you say can and will be used against you in court. Do you understand" that? That you have the right to talk to ’ a lawyer before making any statement or being questioned, or have such lawyer present with you while you’re being questioned or making a statement. Do you understand that? And if you do not have enough money to employ a lawyer, a lawyer will be appointed by the court to represent you at no cost and to have him present before any questions are asked and to have him present while you make any statements. Do you understand that? And if you request a lawyer no questions will be asked until a lawyer is present to represent you. Do you understand that? Ok. It says here after being read, having, having my rights read to me and I understand each of them and I am free, freely volunteering *197 to waive each of these rights as set forth above. I am willing to make a statement to the officers and to answer their questions. (Inaudible) you can read, right?”
(C. 553-54.) Wimbley indicated “yes” after each of Deputy Grimes’s questions. Then, Deputy Grimes continued explaining the form as follows:
“I can read and write the English language and I have read the waiver of rights, I [Deputy Grimes] read them to you, but it has been, I have been, the waiver of'rights has been read to me, and I understand it. No threats or promises have been made to me to induce me to sign this waiver of rights and to make a statement to the officers and to answer their questions. Do you understand that?”
(C. 554.) Wimbley then signed the form, waiving his rights and gave the officers a statement that exculpated himself. After Wimbley had given an exculpatory statement, the following occurred:[4]
“Donald Lolley: Corey, let me tell you something, Juan’s already gave you up and he is making you the shooter. Ok. What’s done’s, done and you can’t change that. Ok. But, what you’re doing is, ’is just making it worse for yourself than if you just straight'out told the truth (Inaudible).'
“Ferrell Grimes: Corey. Corey. We’ve got witnesses that identified you coming out of the store. The shoes that you had on had oil liquid on the bottom of them that’s going to come back matching what was poured in that store. The shoe print you had on matches the shoe print that was in the flammable liquid, whatever it was that was poured on the store. People identified you coming out. Ya’ll went by, you drove down the road you turned around and come back and parked beside of the store. Juan said you went in and he stayed in the car. Said you come running back out and said man get out of here, get out of here, let’s go and said ya’ll left and you went straight to Mobile and went to Joe’s house. Said you went behind Joe’s house and threw uh the gun and’ uh, uh Ray Wheat’s identification in the woods somewhere behind Joe’s house.
[[Image here]]
“Donald Lolley: Let me tell you something. It don’t matter what you said. What does matter is the truth from you and you’ve not told the truth. You need to tell the truth. It’s bad enough, but you can make it worse by lying. You know and need to , tell the truth about it;
“Ferrell Grimes: Cause here’s the thing about it Corey. You’re already charged with it. We’ve got a witness that put you there. We’re going to have forensic evidence that’s going to put you there. You’re, you’re charged with it anyway. Now, you lying and everything ain’t helping you. The only way you’re going to be able to help yourself is to tell the truth. It’s like Sheriff Lolley says we all make mistakes and uh you know sometimes it’s worse than others but things happen that we wish .didn’t happen but .they do happen.
[[Image here]]
“Donald Lolley: Let me tell you something Corey, what’s done’s done." You can’t erase that. It’s, it’s history now. *198 What you can do is to tell the truth and try to, when you go to court you can use that, that you told the truth and instead of telling a whole bunch of lies and being confronted with the truth, when you get up there you can at least say I told it to begin with you know. Which you didn’t tell it to begin with cause I think they’ve already talked to you at one time, right? But you’ve got another opportunity now to tell it, you know. Are you going to let this opportunity leave you again, or are you going to straighten it up and you going to tell the truth about it?
[[Image here]]
“Ferrell Grimes:. You tell us the truth and I’ll get you out of the hole.”
(C. 558-59.)
Wimbley then gave'an inculpatory statement. Thereafter, the following occurred:
“Ferrell Grimes': Alright. You want out of the hole today? You want to go to general population?
“Corey Wimbley: Yes, sir.
“Ferrell Grimes:' Start over from when you got up and tell us the truth, the whole truth,' until the time that the U.S. Marshal (Inaudible) took you down. See you’re going to fefel'better once" you get it off your chest Corey. Arid just like the Sheriff said if you keep' lying to us and you get in court and all this evidence; Corey’s shoes, this witness saw Corey come out of the store, this witness saw Corey and Juan ride down the road, turn around and come back up and park beside the store, this witness saw Corey running out of the store, and you get up there and say no it wasn’t me and I didn’t do this and you know. Just start from when the day started. How you and Juan got together, where ya’ll went and exactly how from the beginning to end till you got to (inaudible).”
(C. 559-60.) Wimbley then confessed to robbing and murdering Wheat and trying to burn the store.
A.
Wimbley first argues that his statement was taken in violation of the Supreme Court’s holding in Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Specifically, Wimbley argues that on December 19 when he was arrested, he invoked his right to counsel under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As a result of his decision to invoke his right to counsel, he was punished by being placed in solitary confinement. Thereafter, on December 23, Wimbley sought to speak with law-enforcement officers about only the conditions of his .confinement,[5] According to Wimbley, during that meeting, officers elicited a confession without first providing the counsel he previously requested in’ violation of the Supreme Court’s holding in Edwards v. Arizona, 451 U.S. at 484-85. Wimbley’s argument is belied by the record and the video recording of his statement.
“Tn Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held:
*199 “ ‘ “[W]hen an accused has invoked his right to have counsel present during custodial .interrogation, a valid waiver of that right cannot be establishecl by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights_ [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until .counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.”
“ ‘451 U.S. at 484-85, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (footnote omitted). The purpose of this rule is* to protect ' an accused in police custody from “ ‘badger[ing]’ or ‘overreaching’— explicit or súbtle, deliberate or unintentional — [that] might otherwise wear down the accused and persuade him'to incriminate himself.notwithstanding his earlier request for counsel’s assistance.” Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
“ ‘ “This ‘rigid’ prophylactic rule, Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, supra, 451 U.S. [477], at 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 [ (1981) ] (whether áceused ‘expressed his desire’ for, or “clearly asserted’" his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S. 1436], at 444-445, 86 S.Ct. 1602, 16 L.Ed.2d 694 [ (1966) ] (whether accused indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking’). Second, if the accused invoked-his right to counsel, courts may admit his responses to further questioning only.on finding that he (a) initiated further discussions-with the police, and (b) knowingly and intelligently waived the right he had invoked. Edwards v. Arizona, supra, [451 U.S.,] at 485, 486, n. 9,”
“ ‘Smith v. Illinois, 469 U.S. at 95, 105 S.Ct. 490, 83 L.Ed.2d 488.’ ”
Phillips v. State, 65 So.3d. 971; 1020 (Ala.Crim.App.2010) (quoting Eggers v. State, 914 So.2d 883, 899-900 (Ala.Crim.App.2004)).
“‘The Supreme Court in Edwards [v. Arizona, 451 U.S. 477 (1981),] made it clear tjiat a suspect may waive his previously asserted right to counsel and respond to interrogation. However, when an accused, has invoked his. right to -counsel, a valid \yaiver of that right cannot be established by showing only that the accused responded, to police-initiated interrogation after again being advised of his Miranda rights.’
“Ex parte Williams, 31 So.3d 670, 676 (Ala.2009).
“ ‘ “[A]n accused ... having expressed his desire to deal with police .only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him unless the.accused himself initiates further- communication, exchanges or conversations with the police.” Edwards v. Arizona, 451 U.S. ,477, 484-485, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981). See also Payne v. State, 424 So.2d 722 (Ala.Crim.App.1982). As has been stated in this jurisdiction, “[a]ny person ar *200 rested who asserts his right to counsel may later change his mind and voluntarily submit to questioning.” Morrison v. State, 398 So.2d 730, 743 (Ala.Crim.App.1979), rev. on other grounds, 398 So.2d 751 (Ala.1981) (citations omitted); see also Sales v. State, 432. So.2d 560 (Ala.Crim.App.1983).’
“Seawright v. State, 479 So.2d 1362, 1366 (Ala.Crim.App.1985). See also Davenport v. State, 968 So.2d 27, 30-31 (Ala.Crim.App.2005).”
McMillan v. State, 139 So.3d 184,195 (Ala.Crim.App.2010).
Consequently, “before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the ‘suspect himself initiates dialogue with the authorities.’” Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (quoting Wyrick v. Fields, 459 U.S. 42, 46, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982)). In Bradshaw, a plurality of the Supreme’ Court explained that “there are undoubtedly situations where a bare inquiry by either' a defendant or by a police officer should not be held to ‘initiate’ any conversation or dialogue.” 462 U.S. at 1045. Simply put,
“[t]here are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation-. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally ‘initiate’ a conversation in the sense in which that word was used in Edwards.”
Bradshaw, 462 U.S. at 1045. Rather, to initiate a conversation under Edwards, a person in police custody must express a “desire for a generalized discussion about the investigation[,] not merely a necessary inquiry arising out of the incidents of the custodial relationship.” Bradshaw, 462 U.S. at 1046.
It is important to note that Edwards merely creáted “a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers [after invoking his right to counsel].” Bradshaw, 462 U.S. at 1044. Under an Edwards analysis, after an accused individual in police custody has invoked his right to counsel and later gives a statement, the only question for the court is whether the accused initiated the discussion about the investigation of his.crime. Id. at 1045. If the accused did, then the Edwards inquiry stops and the prophylactic rule does not apply. Id. An Edwards analysis does not -involve determining whether the defendant knowingly and voluntarily waived his right to counsel and gave his statement. Id. “When the accused initiates communication with police, the paradigm is reset and police may explore ’ whether the accused is willing to answer questions.” State v. Stevens, 343 Wis.2d 157, 180, 822 N.W.2d 79, 91 (2012). “But even if [the rule established in Edwards is satisfied because] a conversation taking place after the accused has expressed his desire to deal with the police only through counsel, is initiated by the accused, ... the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.” Bradshaw, 462 U.S. at 1044 (quotation marks omitted). See also Stevens, 343 Wis.2d at 180, 822 *201 N.W.2d at 91 (recognizing that after the rule established in Edwards is satisfied-by the accused’s initiation of a.discussion, law-enforcement officers “may proceed with custodial interrogation [only] if the accused again is given a Miranda warning and again waives his Miranda rights”). However, “the inquiries [to determine whether the rule established in Edwards and to determine whether a waiver of counsel was voluntary] are separate.” Bradshaw, 462 U.S. at 1045; see Ex parte Williams, 31 So.3d 670, 682 (Ala.2009).
In this section of his brief, Wim-bley argues that his statement was taken in violation-of the rule established in-Edwards.- The parties do not dispute, that -Wimbley-invoked his right to counsel before giving his statement.' Therefore, the only question under Edwards is whether the circuit court abused its discretion by determining that Wimbley .initiated the discussion regarding the investigation, of his crime.
The State’s evidence .established that Wimbley was arrested on December 19, 2008, and invoked his right to counsel. Because the investigation into Wimbley’s crime was ongoing, Wimbley was placed in solitary confinement to prevent him from communicating with other inmates. ‘ On December 23, Wimbley asked a jailer for permission to speak with the officers investigating his crime. When Deputy Grimes asked Wimbley: “Did you request to talk to us again?” (C. 553.) Wimbley replied: “Yes, Sir, on one condition. ... I told them I will tell them everything I know if they will take me to general population— ” (State’s exhibit 56.)
Wimbley clearly initiated a discussion with the officers investigating his crime with “a' willingness and a desire for a genéralized discussion about the investigation[,] not merely a necessary inquiry arising out of the incidents of the custodial relationship.” Bradshaw, 462 U.S. at 1046. Wimbley sought to speak with officers investigating his crime, not merely his jailers. -When he met with the officers investigating his crime, he stated that he had asked to speak with them to “tell them everything [he knew].... ” (State’s exhibit 56.) See Bradshaw, 462 U.S. at 1045-46 (holding that the accused’s question, “[w]ell, what is going to happen to me now ... evinced a willingness and a desire for a generalized discussion about the investigation”; therefore, there was no violation of the rule established in Edwards). Because Wimbley “evinced a willingness and a desire for a generalized discussion about the investigation,” the circuit court did not abuse its discretion by finding that Deputy Grimes and Donald Lolley complied with the rule established in Edwards. Id. Therefore, this issue does not entitle Wim-bley to any relief.
Wimbley next' argues that his waiver of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and his statement were involuntary. According to Wimbley, his waiver of his Miranda- rights yras involuntary because he was punished for invoking his right to counsel by being held incommunicado, without access to counsel, a telephone, or his family, for four days in solitary confinement in a room that lacked light, :water, and bedding; Wimbley argues .that his statement was- involuntarily given for an .-additional reason: the inter-vfewing officers induced his statement with the promise that he would be moved from solitary confinement to general population in exchange for his statement. According to Wimbley, those circumstances rendered his waiver of his- Miranda rights and the following statement involuntary.
*202 “The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person )... shall be compelled in any . criminal case to be a witness against himself. Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 668, 81 act. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).”
McLeod v. State, 718 So.2d 727, 729 (Ala.1998). Thus,,,
“[t]he general rule is that a confession or other inculpatory statement is prima facie involuntary and inadmissible and the burden is on the State to prove by a preponderance of the evidence that such a confession or statement is voluntary and admissible. See, e.g., Ex parte Price, 726 So.2d 1063 (Ala.1998). To prove voluntariness, the State must establish that the defendant ‘made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not” overborne by pressures and circumstances swirling around him.’ Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App.1988). If the confession or inculpatory statement is the result of custodial interrogation, the State must also prove that the defendant was properly advised of, and that he voluntarily waived, his Miranda rights. See Ex parte Johnson, 620 So.2d 709 (Ala.1993), and Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002).”
Eggers v. State, 914 So.2d 883, 898-99 (Ala.Crim.App.2004). Although the volun-tariness of an accused’s waiver of his Miranda rights and the voluntariness of a statement are separate and distinct inquiries, both inquiries are determined by reviewing the totality of the circumstances and share many of the same factors. See Massachusetts v. Medeiros, 395 Mass. 336, 479 N.E.2d 1371 (1985) (although volun-tariness of Miranda waiver and voluntariness of statement are distinct inquiries, each analysis involves totality-of-circumstances test); Massachusetts v. Woodbine, 461 Mass. 720, 729, 964 N.E.2d 956, 964 (2012) (“ ‘The voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors.’ ” (quoting Massachusetts v. Edwards, 420 Mass. 666, 651 N.E.2d 398 (1995))).
Regarding a waiver of Miranda rights, the Supreme Court of the United States has explained:
“A statement is not ‘compelled’ within the meaning of the Fifth Amendment if an individual ‘voluntarily, knowingly and intelligently’ waives his constitutional privilege. Miranda v. Arizona, supra, at 444, 86 S.Ct., at 1612. The inquiry whether a waiver is coerced ‘has two distinct dimensions.’ Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986):
“First the relinquishment of the right must have been voluntary in the sense that it was the product of .a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both-of .the.-nature of the right being abandoned and the consequences of the decision to abandon it. Only if the “totality of the circumstances surrounding the in *203 terrogation” reveal both an uncoerced choice -and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.’ Ibid, (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).”
Colorado v. Spring, 479 U.S. 564, 573,107 5.Ct. 851, 93 L.Ed.2d 954 (1987). “Absent evidence that [an accused’s] will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct, his waiver of his Eifth Amendment privilege was voluntary under this Court’s decision in- Miranda.”[6] Id. (quotation marks omitted).
Regarding the voluntariness of a statement, the Alabama Supreme Court has explained:
“It has long been held that a coñfession, or any inculpatory statement,- is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id....
“The Supreme Court has- stated that when-a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389-U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Bakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’).... ”
McLeod, 718 So.2d at 729 (footnote omitted).
Thus, “[although [courts] inquire separately into the voluntariness of the defendant’s waiver of Miranda rights and the voluntariness of the statements, both inquiries require [courts] to.examine the totality of the circumstances surrounding the making of the statements to ensure that the defendant’s will was not .overborne.” Massachusetts v. Hoose, 467 Mass. 395, 403, 5 ,N.E.3d 843, 852 (2014) (citations .omitted). . The Alabama Supreme Court has explained:
“To determine if a defendant’s will has been overborne, [a court] must assess *204 ‘the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure’; ‘[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.’ Jackson [v. State], 562 So.2d [1373,] 1380-81 [ (Ala.Crim.App.1990) ] (citations omitted).”
McLeod, 718 So.2d at 730. Further,, “a confession is not rendered involuntary if it was made in response to a.promise of benefit that was solicited by the accused.” Ex parte Siebert, 555 So.2d 780, 782 (Ala.1989) (citations omitted). See also Eakes, 387 So.2d at 860 (holding that “a confession is not rendered involuntary by a promise of benefit that was solicited freely and voluntarily by the accused”), abrogated on other grounds, McLeod, 718 So.2d at 727; Mack v. State, 500 So.2d 489, 492 (Ala.Crim.App.1986) (same); Thomas v. State, 531 So.2d 45, 48 (Ala.Crim.App.1988) (same); State v. Watters, 594 "So.2d 242, 246 (Ala.Crim.App.1992) (same). The Arizona Supreme Court has explained:
“[Where] the proposal for the ‘deal’ came from the defendant, the promise did not interfere -with the appellants’ exercise of a free volition in giving the confession.... [Where] the promise was solicited by the accused, freely and voluntarily, .., they cannot be heard to say that in accepting the promise they were the victims of compelling influences.”
State v. McVay, 127 Ariz. 18, 21, 617 P.2d 1134, 1137 (1980) (citations and quotation marks omitted). In other words, when the accused freely and voluntarily solicits a benefit in exchange for a confession, it cannot be said that the accused’s will was overborne by the promise of that benefit. Cf. Ex parte Siebert, 555 So.2d at 782.
1.'
Wimbley argues that his waiver of his Miranda, rights was involuntary because he was punished for invoking his right to counsel by being held incommunicado, without access to his family, counsel, or i a telephone; for four days, in solitary confinement in "a room that lacked light, water, and bedding. .Wimbley’s argument is without merit....
The main thrust of Wimbley’s argument rests on his assertion that he was held incommunicado for four days. This assertion, however, is refuted by the record and is false. Wimbley was not, as he argues, held incommunicado without access to his family, counsel, or a telephone. Rather, the record shows that, while in solitary confinement, Wimbley had- access to and actually met with his-family. See (C. 572) (In a conversation between'Wimbley and his mother, Wimbley’s mother informed him that she had been, to the jail but chose not to see him because it was too hard for her.. Wimbley replied: “I know it. Thomas told me.”).[7] Further, there is no indication in the record that Wimbley was. denied access to a telephone. Although counsel" had not yet been appointed to represent Wimbley, there is no indication that he was prevented from contacting, or was otherwise denied access to, an attorney. Accordingly, Wimbley’s argument that his waiver of his Miranda rights was involuntary because he was held incommunicado is without merit.
Wimbley also argues that his waiver of his Miranda rights was involuntary because he was held in a room for four days without water, light, or a bed. According to Wimbley, he was held in- those conditions without access to people who would *205 help him and without any sign that his conditions were going to change; therefore, his “only option for requesting better conditions was to contact the sheriffs office.” (Wimbley’s brief, at 21.)
Contrary to Wimbley’s assertion, there is no indication in the record that he was denied water, light, or a bed. Before waiving his rights, Wimbley stated:
“I told them I will tell them everything I know if they will take me -to general population, I’ll sleep on the-floor. It’s dark in there, the water don’t work, just move me to general population.”
(State’s exhibit 56.) Wimbley did not say that the room had no light. Rather, he stated that it was dark. The circuit court could have reasonably interpreted Wira-bley’s statement as indicating that the lighting in the room was not 'sufficiently bright to satisfy Wimbley, not that the room lacked any light. See Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993) (“ ‘In reviewing the correctness of the trial court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.’”) (quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985)). Further, Wimbley did not say that he lacked water. Instead, he said that the water in the room did not work. Nothing indicates that he was denied adequate water upon request. Finally, Wimbley did not say that he was denied a bed; instead, he offered to sleep on the floor in general population. Accordingly, Wimbley’s argument that the circuit court abused its discretion by finding that he voluntarily waived his Miranda rights is not supported by the record.
Moreover, even if the cell in which Wim-bley was held did, as Wimbley argues, lack adequate lighting, running water, and a bed, this Court cannot say that the circuit court abused its discretion by determining that Wimbley, nevertheless, voluntarily waived his Miranda rights. Assuming that the conditions were as Wimbley described, those conditions, “although non-ideal [were] far from oppressive.” United States v. Odeh, 552 F.3d 177, 214 (2d Cir.2008) (“Taking into account the totality of the circumstances, as we must, we cannot conclude that, because Al-’Owhali was detained incommunicado for fourteen days [sometimes in a cell with a concrete bed], the statements he made after waiving his Miranda rights were involuntary.”); United States v. Kiendra, 663 F.2d 349, 351 (1st Cir.1981) (Nineteen-year-old’s solitary confinement for 30 days “cannot be presumed to have weakened his will to such an extent that he was incompetent to exercise his rights.”); Brown v. United States, 356 F.2d. 230, 232 (10th Cir.1966) (placement in disciplinary segregation for several days did not render confession involuntary); United States v. Webb, 311 Fed. App’x 582, 584 (4th Cir.2009) (unpublished opinion not reported in F.3d) (Webb initiated contact and knowingly and voluntarily waived his rights after being held in isolation for four days without access to counsel); Clark v. Solem, 693 F.2d 59, 61-62 (8th Cir.1982) (60 days of solitary confinement did not render plea involuntary). During the four days Wimbley was held in solitary confinement, he had access to and was visited by his family. During the interview with law-enforcement officers, he did not complain of hunger, thirst, or sleep deprivation. He appeared well nourished and alert. Further, Wimbley did not appear dirty or unkempt. Consequently, the record does not support Wimbley’s assertion that the conditions in which he was kept were so oppressive as to render his waiver of his Miranda rights involuntary.
Rather, the record establishes that, at the time he gave his statement, he was an *206 almost 22-year-old[8] father who had graduated from high school and was enrolled in college. Wimbley was described as a “bright young man” (C. 366), and he had had prior experience with the criminal-justice system. This bright young man initiated contact with officers, and Deputy Grimes read him • his Miranda rights. Wimbley indicated that he understood his rights and wished to waive them. Wim-bley then signed a waiver form indicating that he wished to waive his rights and that he was doing so freely and voluntarily. The waiver form Wimbley signed indicated that no threats or promises were made to induce him to waive his rights. The recording of Wimbley’s statement establishes that no threats or promises, other than a promise solicited by Wimbley, were made to induce him to waive his rights.
Nothing in the record indicates that the law-enforcement' officers pressured Wim-bley to initiate contact with them or that Wimbley lacked the capacity to resist pressure placed on him to‘waive his rights. Rather, the record indicates that Wimbley initiated contact with law-enforcement officers to discuss the charges against him and freely 'and voluntarily waived his Miranda rights. Consequently, this Court cannot say that the circuit court abused its discretion by denying Wimble/s motion to suppress his statement, and this issue does not entitle him'to any relief.
'‘2.
Wimbley next argues that he did not voluntarily give his statement to law-enforcement officers., Specifically, Wimbley asserts that he was unlawfully induced to give his statement by the law-enforcement officers’ promise that, if he confessed, he would be removed from solitary confíriément and placed in general population.[9] Wimbley’s argument is without merit.
As stated above, “ ‘[t]he true test of determining whether extrajudicial confessions are involuntary is whether the defendant’s will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will.’ ” Ex parte Hill, 557 So.2d 838, 841 (Ala.1989) (quoting Eakes, 387 So.2d at 859, citing in turn Townsend v. Sain, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and Elliott v. State, 338 So.2d 483, 485 (Ala.Crim.App.1976)). “It has long been held that a confession, or any inculpatory statement, is involuntary if [the accused’s will to resist is overborne]- through force or [overborne by an] induce[ment] through an express or implied promise of leniency.” McLeod, 718 So.2d at 729 (citing Bram v. United States, 168. U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). However, it is equally well established that “a confession is not rendered involuntary if it was. made in response to a promise of benefit that was solicited by the accused.” Ex parte Siebert, 555 So.2d at 782 (citations omitted). See also Eakes, 387 So.2d at 860 (holding that “a confession is not rendered involuntary by a promise of benefit that was solicited freely and voluntarily by the accused”), abrogated on other grounds, McLeod, 718 So.2d at 727; Mack v. State, 500 So.2d 489, 492 (Ala.Crim.App.1986) (same); Thomas v. State, 531 So.2d. 45, 48 (Ala.Crim.App.1988) (same); State v. Waiters, 594 So.2d 242, 246 (Ala.Crim.App.1992) (same). The Arizona Supreme Court has explained:
“[Where] the proposal for the ‘deal’ came from the defendant, the promise , did not interfere with the appellants’ *207 exercise of a free volition in giving the confession— [Where] the promise was solicited by the accused, freely and ’Voluntarily, ... they cannot be heard to say that in accepting the promise they were the victims of compelling influences.”
McVay, 127 Ariz. at 21, 617 P 2d at 1187 (citations and quotátion marks omitted). In other words, when the accused freely and voluntarily solicits a benefit in exchange for confessing, it cannot be said that the accused’s will was overborne'by the promise of "that benefit. Cf. Ex parte Siebert, 555 So.2d at 782.
The record establishes that .Wim-bley freely and voluntarily solicited the promise to be moved from solitary confinement to general population in exchange for his statement. See Ex parte Siebert, 555 So.2d at 782; Eakes, 387 So.2d at 860; McVay, 127 Ariz. at 21, 617 P.2d at 1137. Wimbley was arrested on December 19, 2008. Because the investigation into Wim-bley’s crime was ongoing, he was placed in solitary confinement. As discussed above, there is nothing in the record indicating that the conditions of the cell were oppressive, i.e., that there was no light ór that Wimbley was denied adequate food, water;' or use of a bathroom facility. See Webb, 311 Fed.App’x at 584 (unpublished opinion not reported in F.3d) (holding that the accused initiated contact and knowingly and voluntarily waived his rights after 'being held in isolation for four days without access to counsel); United States v. Odeh, 552 F.3d at 214 (“Taking into account the totality of the circumstances, as we must, we cannot conclude that, because Al-’Owhali was detained incommunicado for fourteen days, the statements he made after waiving his Miranda rights were involuntary.”); Kiendra, 663 F.2d at 351 (holding-that an accused’s solitary confinement for 30 days “cannot be presumed 'to have weakened his will-to such an extent that he was incompetent to exercise his rights”). After four days in solitary -confinement, Wimbley, a bright young man who had experience with the criminal-justice system, summoned- law-enforcement officers to speak about the accusations against'Rim. (State’s.Exhibit 56.) After being summoned,:-Deputy Grimes asked Wimbley whether he wanted to speak with law-enforcement officers, and Wimbley indicated that he did., Wimbley then informed Deputy Grimes that: he would tell Deputy Grimes everything he knew in exchange for being moved.,to general population. At that point, Deputy Grimes read Wimbley his Miranda rights, and Wimbley indicated that he understood his rights. Wimbley then signed a waiver form indicating that he wished to waive his rights and that he was doing so freely and voluntarily. The recording of Wimbley’s statement establishes that, other than the promise solicited by Wimbley; no threats or promises were made to induce him to waive his rights and confess. Thereafter, Wimbley gave his statement.
Nothing in the record indicates that the law-enforcement officers pressured Wim-bley to initiate contact to make a statement or that Wimbléy lacked the'capacity to resist any pressure placed on- him to confess: Rather, the record establishes that, without being prompted, Wimbley, a “bright young man” (C. 366) with experience with the criminal-justice system, initiated contact with law-enforcement officers and freely and voluntarily solicited a promise to be moved to general population in exchange for his statement. Based on these facts, Wimbley has not met his burden of showing that his-“confession [was] rendered involuntary by a promise of benefit-that was solicited freely and voluntarily by the [him].” Eakes, 387 So.2d at 860. See also Ex parte Siebert, 555 So.2d at 782.
*208 Moreover, even if the promise to move Wimbley to general population were an-improper inducement, which, based on Wimbley’s actions, it was not, the, circuit court’s .determination that Wimbley’s confession was voluntary should still -be affirmed. Again, “[t]he. true test of determining whether extrajudicial confessions are involuntary is whether the. defendant’s will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will.” Ex parte Hill, 557 So.2d at 841.
The circuit court was presented with evidence that showed that Wimbley’s decision to confess was not the product of the promise to move him to general population. In a recorded conversation with his mother, the following occurred:
“[Mother]: Baby. Baby. Baby. Oh baby. You done already confessed?
“[Wimbley]: Yes.
■“[Mother]: They didn’t force you to, did they?
“[Wimbley]: Yes.
“[Mother]: Row’d they force you into?
“[Wimbley]: They told me what Juan said.
“[Mother]: How you know that what he said?
.“[Wimbley]: Cause it’s what happened.
“[Mother]: Huh?
“[Wimbley]: It’s what happened.
“[Mother]: Oh, God. Oh, God.”
(C. 571.)
Accordingly, the circuit court was presented evidence indicating that Wimbley chose to confess because he believed that his accomplice had already confessed, not because he was induced by any promises made by law-enforcement officers. Consequently, the circuit court’s determination that Wimbley’s will was not overborne by any promises of a benefit was supported by evidence in the record. See McLeod, 718 So.2d at 730; Brown v. State, 56 So.3d 729, 738 (Ala.Crim.App.2009); Byrd, 78 So.3d at 455. Therefore, this issue does not entitle Wimbley to any relief.
C.
 Even if the circuit court erroneously allowed the State to admit Wimbley’s statement for whatever reason, any error was harmless beyond a reasonable doubt. See Rule 45, Ala. R.Crim. P.; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that “before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt”).
In Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1993), the Alabama Supreme Court held that an error may be harmless if “evidence of guilt is ‘virtually ironclad.’ ” (citations and quotation marks omitted). “ ‘When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.’-” Wiggins v. State, [Ms. CR-08-1165, May 2, 2014] — So.3d —, — (Ala.Crim.App.2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Thus, an erroneously admitted confession will be harmless if, excluding the confession, the remainder of the “evidence of guilt is ‘virtually ironclad.’” Ex parte Greathouse, 624 So.2d at 211. See also Albarran v. State, 96 So.3d 131, 154 (Ala.Crim.App.2011); Richardson v. State, 819 So.2d 91, 103 (Ala.Crim.App.2001).
The State’s evidence, excluding Wim-bley’s confession, overwhelmingly estab *209 lished his guilt. The State presented evidence establishing that Wimbley’s shoe matched a shoe print found in the acceler-ant used to attempt to burn the store. During the offense, an eyewitness, who had known Wimbley since they were teenagers, saw him running from the store to a car where Crayton was waiting. Shortly after the murder, Crayton and Wimbley drove to Barnes’s house where they behaved suspiciously. While at‘ Barnes’s house, Wimbley and Crayton argued over who would have to drive the car they used during the robbery and murder. Wim-bley, then, had Barnes drive him to the bus station where he attempted to flee the state. When Wimbley was arrested, he possessed $325. in cash. When law-enforcement officers searched Barnes’s property where Wimbley had been presént, they found the murder weapon and various items belonging to Wheat. Finally, in a recording of a conversation that Wimbley had with his mother, he admitted his involvement in Wheat’s murder.
Based oh the foregoing, after excluding Wimbley’s statement, the State’s “evidence of [his] guilt [was] ‘virtually ironclad’”; therefore, any error in the admission of Wimbley’s statement was harmless beyond a reasonable doubt. Ex 'parte Greathouse, 624 So.2d at 211. Consequently, this issue does not entitle Wimbley to any relief.
II.
Wimbley asserts that the circuit court erred when it “failed to strike" multiple biased jurors for cause.” (Wimbley’s brief, at 28.) The veniremembers who Wimbley argues should have been removed for 'cause by the circuit court fall into four categories: 1) “jurors who would not give meaningful consideration to a life without [the possibility of] parole sentence”; 2) “a juror- who said he could not follow the presumption, of innocence”; 3) “jurors whose., impartiality was compromised by their close relationships with the victim and/or the victim’s family”; and 4) “jurors with close business ties to the prosecutor’s office and the sheriffs department.” (Wimbley’s brief, at 28.)
The grounds for challenging a juror for cause are codified at § 12-16-150, Ala. Code 1975. This Court has explained:
“‘To justify a challenge for cause, there must be a proper statutory ground or “‘some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.’” Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This court has held that “once a juror indicates initially that he or she is biased or prejudiced or has deep seated impressions” about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989), The test to be applied in determining whether" a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror “need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.” Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986).’
“Ex parte Davis,. 718 So.2d 1166, 1171-72 (Ala,1998).
“ ‘The test for determining whether a strike rises to the level of a challenge for-cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.” *210 Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion? ” Nettles, 435 So.2d at 153.’
“Dunning v. State, 659 So.2d 995, 997 ’’(Ala.Crim.App.1994).
“ ‘The qualification of a juror is a matter within the discretion of the, trial court. Clark v. State, 443 So.2d 1287, 1288 (Ala.Cr.App.1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.’ Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990). ‘ “[Jjurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.” Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000).’ Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008).
“ ‘It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination techniques that'frequently are employed ... [during voir dire]...’. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge may properly choose to believe'those statements that were the most fully articulated or that appeared to bé have been least influenced by leading.’
“Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).”
Thompson v. State, 153 So.3d 84, 116 (Ala.Crim.App.2012).
A
Wimbley contends that the circuit court erred in not removing for cause “jurors who would not give meaningful consideration to a life without [the possibility .of] parole..sentence.” (Wimbley’s brief, at 28.) Those yeniremembers were J.W., Wi. Wp., and We.Wi. .
'“A prospective juror may not be ex-eluded from a capital case for personal opposition to the death penalty unless the juror’s beliefs would ‘“prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ Wainwright v. Witt, 469. U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (footnote omitted). On the other hand, ‘[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused.’ Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S, 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Accord, Bracewell v. State, 506 So.2d 354, 358 (Ala.Cr.App.1986).”
Kuenzel v. State, 577 So.2d 474, 484-85 (Ala.Crim.App.1990).
L
The record demonstrates that the following occurred during .the individual voir dire of veniremember J.W.:
“THE COURT: .... At [the penalty] phase would you consider, under- the instructions of the Court either life without parole or death; or would you have *211 a preconceived opinion about one or the other if he’s convicted of capital murder; does that make sense?
“[J.W.]: Yes, sir. I reckon I could— yeah, I could consider • it, listening to them, you know.
“THE COURT: Uh-huh.‘
“[J.W.]: But that’s always been a big thing with me. If you know a hundred percent that he murdered somebody, how I feel in my opinion—
“THE COURT: Yes, sir.
“[J.W.]: If you murder somebody, you deserve it, yourself. That’s my opinion. But I will listen—
“THE COURT: When you say deserve it, you mean deserve to be killed?
“[J.W.]: The death penalty.
“THE COURT: All right. Okay. Any questions?
“[DEFENSE COUNSEL 1]: Would you consider life instead of the death penalty, even though you’ve sat on the jury and he was found guilty; or are you saying if he is found guilty, you’re going to vote for the death penalty?
“[J.W.]: I would consider life. I would consider, it, yeah. If he is found guilty, I would consider life without parole. But, like I said, my opinion if I know — if I knew he was, I’d probably be somewhere else besides the jury.'' 'To me, I just consider the déath penalty. Like, I would consider life, you know, life without parole, I reckon, since I am the jury.
“[DEFENSE COUNSEL 1]: Would you give more consideration to one of those options than you would the other option? I mean, could you go into the second phase with the two options equal at that point in time until you heard the mitigating and the aggravating circumstances, or would you automatically be in a position to recommend the death penalty, and you would have to be convinced otherwise for you to do the other? ,
; “[J.W.]: I would say I would probably have to be convinced.
■ “[DEFENSE COUNSEL 1]: So, you would have a preconceived belief that because he’s been found guilty of capital murder that the death penalty would be the appropriate punishment, regardless of anything else?
“[J.W.]: Kind of hard. It depends on like how, what you call them, mit—
“THE COURT: Mitigating and aggravating circumstances.
“[J.W.]: How I took that — like I said, it all depends;
“[DEFENSE COUNSEL 1]: But you’re telling us you would start that process with the preconceived belief that the death penalty would be the appropriate of the two?
“[J.W.]:. Yeah, starting it.
“[DEFENSE COUNSEL-1]: Okay.
“[PROSECUTOR]: But as I understand you, you favor the death penalty in capital murder cases, is what you’re talking about, that’s your personal opinion?
•“[J.W.]: (Nods head)
“[PROSECUTOR]: But as a juror, you could sit and listen to both aggravating and mitigating factors before making your recommendation one way or the other; is that what you’re telling us?
“[J.W.]: Yes, sir. Like I said, I believe in the death penalty. But, like I said, I will if you said it.”
(R. 545-48.)
Wimbley challenged J.W. for cause, arguing that “[h]e said clearly he would have a preconceived belief that the death penalty was an appropriate punishment.” (R. *212 548.) The circuit court denied the challenge.
The record demonstrates that J.W. did not believe that the death penalty should be imposed in every capital case. Rather, the record establishes that, although J.W. believes in the death penalty, he would consider both life without the possibility of parole and death. Therefore, the circuit court did not abuse its discretion in denying Wimbley’s challenge for cause of J.W. See Kuenzel, supra.
2.
Wimbley next’argues that the circuit court erroneously failed to remove Wi.Wa. because WiWa. would have automatically voted to recommend a sentence of death. This Court disagrees.
The record demonstrates that the following occurred during the individual voir dire of veniremember Wi.Wa.:
“THE COURT: .... Do you believe, do you already have a fixed opinion that if someone is found guilty of capital murder, killing somebody else in the commission of a crime, then do you have a fixed opinion about whether or not that person ought to get the death penalty?
“[Wi.Wa.]: I believe that, you know, like capital murder, where they plan out murder. I would say like eighty-five percent of me wants to say, yeah, you know, death penalty. But there are exceptions to it, I would think. It’s hard for me to explain how I feel about that. But I feel like, yeah, I do feel like if somebody takes a life, you know, that they deserve the death penalty more than life in prison in most cases. There are exceptions to it, I would say.
“[DEFENSE COUNSEL 1]: Are you telling us, though, that you can listen to the facts and evidence in this case and make a decision based upon this case and not your preconceived beliefs?
“[Wi.Wa.]: Yeah. And’ you asked something about that earlier. Yeah, I could listen to the facts, you know. I was just telling you it’s just the way I always felt about murder, is just what I was just saying.
“[DEFENSE COUNSEL 2]: Could you listen to the aggravating and mitigating on the second phase like you say you can listen to the facts on the first phase?
“[Wi.Wa.]: Uh-huh.
“THE COURT: Is that yes?
“[Wi.Wa.]: Yes, sir.
■ “[DEFENSE COUNSEL 1]: On your questionnaire, [Wi.Wa,], you said that if somebody commits a crime like murder that they get the death penalty.
“[Wi.Wa.]: Yeah, and that’s what I think I said’ right there, you know, but I’m not a hundred percent in that. You know, it’s kind of liké part of me feels that way and then part of me — majority of it, like out of a hundred percent, like eighty-five percent of me feels that way.
“[DEFENSE COUNSEL 1]: So, if there was a guilty verdict of capital murder in this case—
“[WiWa.]: I mean, I would listen to . all of the facts. I’m still not just going to go in there and say, okay, you know, we found him guilty, he deserves the death penalty, you know, I would decide that on the facts.
“[DEFENSE COUNSEL 1]: What you heard during that part?
“[Wi.Wa.]: Yes, sir.
.“[DEFENSE COUNSEL 1]: Would you still have that eighty-five percent rule there — let’s get to the guilt.
“[WiWa.]: I know I’m complicated.
“[DEFENSE COUNSEL 1]: If you found him guilty,-would at that point in *213 time you put those two options on the table on equal planes, or would you,put the death sentence at eighty-five percent and life at fifteen percent, and we would have to convince you to bring that above and come up there, or would you start those two options equally after the guilt phase?
“[Wi-Wa.]: I will be honest with you. I feel like it probably be after that phase, like after I heard all the information, it would have to be convincing to me that he would be found innocent, you know.
“[DEFENSE COUNSEL -1]:- I mean—
“[Wi.Wa.]: Not innocent, but like life in prison is what I mean to say. -
“[DEFENSE COUNSEL 1]: You’re •saying at that point you would place a burden on Mr. Wimbley to prove to you why he should not be given the death penalty?
“[Wi.Wa.]: Yes, sir, I suppose that’s what I’m saying.
“[DEFENSE COUNSEL 1]: And you could not give him life without him proving to you he deserved it; is that what you’re saying?
“[Wi.Wa.]: Yes, sir, or just hearing enough facts to convince me that he is innocent, which I guess that’s what you’re saying. .
“[DEFENSE COUNSEL 1]: ■ Well, you know, at that point we’re beyond the guilt or innocence phase, at that point we’re talking about those aggravating and mitigating,. is what we’re talking about.
“[Wi-Wa.]: You’re talking about the other phase?
“[DEFENSE COUNSEL 1]: The penalty phase. And my question to you was, if you sat on a jury, and he was found guilty- of capital murder, you then got the two options, life without or death. Would you, weigh those options equally to begin with, and then listen to the State’s aggravating, our mitigating factors and make your decision, or—
“[Wi.Wa.]: I understand what you’re saying.
“[DEFENSE COUNSEL 1]: Or would you go into that phase—
“[Wi.Wa.]: No, I would go in open-minded.
“[DEFENSE COUNSEL 1]: You’re telling us you would have no preconceived notion that the death penalty was appropriate?
“[Wi.Wa.]: Yes, sir.
“[DEFENSE COUNSEL 1]: And are you telling me now you wouldn’t put a burden on him to prove he should be given life as opposed to death?
“[Wi.Wa.]: That’s what I’m saying, when I go into the second phase, I would be like, you know, open-minded about it.
“[DEFENSE COUNSEL 1]: You wouldn’t weigh one option more than the other?
“[WLWaJ: No, sir.
“[DEFENSE COUNSEL 1]: Your eighty-five percent rule would be gone at that point?
“[Wi-Wa.]: That’s just how I feel. It’s hard to explain it, really.”
(R.' 550-54.)
The record demonstrates that Wi.Wa. would not have automatically voted to recommend the death penalty upon a conviction for capital murder. Rather, Wi.Wa. indicated that he would be open-minded about both options in the penalty phase. Consequently, the circuit court did not commit error in leaving Wi.Wa. on the venire. See Kuenzel, supra.
*214 3.
The record demonstrates that the following occurred during the individual voir dire of veniremember We.Wi.:
“[DEFENSE COUNSEL ■ 1]: All right. [We.Wi.], in your questionnaire that you filled out on Monday, when the question was asked what was your position on the death penalty, your response .was: ‘keep the chair warm,’ what did you mean by that?
“[We.Wi.]: Use it, don’t let it get rusty. ' You know, electrical equipment sitting idle goes bad.”
(R. 555.) Thereafter, We.Wi. explained that he believed in the use of the death penalty. After stating that he believed in the use of the death penalty, We.Wi. unequivocally stated that he did not have a fixed opinion regarding, a sentence of death and that he would wait until he heard all the evidence and then consider both a sentence of death and a sentence of life without the possibility parole. Therefore, the circuit court did not commit error in leaving We.Wi. on the venire. . See Kuen-zel, supra.
B.
Wimbley next argues that the circuit court committed error in not removing Wi.Wa.: because he “said he could not follow the presumption of innocence” in the guilt phase.. (Wimbley’s brief, at 28.) This Court disagrees.
During voir dire, the circuit court asked a number of questions to illicit information as to whether the members of the venire could honor the presumption of innocence. Wi.Wa. did not give any responses indicating that he would disregard the presumption. Later, the parties questioned the members of the venire regarding their beliefs bn the death penalty. While being questioned about his beliefs regarding the death penalty, the following occurred:
“[DEFENSE COUNSEL 1]: If you found him guilty, would at that point in time you put those two options on the table on equal planes, or would you put the death sentence 'at eighty-five percent and life at fifteen percent, and we would have to convince you to bring that above and come up there, or would you start those two options equally after the guilt phase?
“[Wi.Wa.]: I will be honest with you. I ■ feel like it- probably be after that phase, like after I heard all the information, it would have to be convincing to me that he would be found innocent, you know.
“[DEFENSE COUNSEL 1]: I mean—
“[Wi.Wa.]: Not innocent, but like life in prison is what I mean to say,
“[DEFENSE COUNSEL 1]: You’re saying at that point you would place a burden on Mr. Wimbley to prove to you why he should not be given the death penalty?
“[Wi.Wa.]: Yes, sir, I suppose that’s what I’m saying.
' “[DEFENSE COUNSEL 1]: And you could not give him life without him proving to you he deserved it; is that what you’re saying?
“[Wi.Wa.]: Yes, sir, or just hearing enough facts to convince me that he is innocent, which I guess that’s what you’re saying.
“[DEFENSE COUNSEL' 1]: Well, you know, at that point we’re beyond the ■guilt or innocence phase, at that point we’re talking about those aggravating and mitigating, is what we’re talking about.
“[Wi.Wa.]: You’re talking about the other phase?
“[DEFENSE. COUNSEL 1]: The penalty phase. And my question to you *215 was, if you sat on a jury, and he was found guilty of capital murder, you then got the two options, life without or death. Would you weigh those options equally to begin with, and then listen to the State’s aggravating, our mitigating factors and make your decision, or—”
(R. 552-54.)
When Wi.Wa. referred to innocence, he appears to have misspoken. He indicated that he understood and would honor the presumption of innocence. Later, when discussing punishment, he referred to innocence, then stated, “[n]ot innocent, but like life in prison is what I mean to say.” (R. 553.) Accordingly, this Court cannot say that the circuit court abused its discretion by failing to remove Wi.Wa. because he would not abide by the presumption of innocence.
C.
Wimbley also asserts that the cireuit court erred by not removing for ' cause “jurors whose impartiality was compromised by their close relationships with the victim and/or the victim’s family.” (Wim-bley’s brief, at 28.) Those venirememhers were E.P., J.S., J.T., J.D., W.D., C.K., P.O., and We,Wi.
1.
Wimbley argues that the circuit court erred in not removing veniremember E.P. for cause. This Court disagrees.
During individual voir dire, E.P. stated that she knew Wheat from having supervised him at a previous job. When asked whether, if selected for the jury, she believed that she could “in an unbiased and unprejudiced, way listen to the'law and evidence, fact, in the courtroom and base [her] verdict on that,” E.P. said that she thought she could. (R. 87.) E.P. later nodded when asked by the circuit court if she “would be able to deal with that and still serve on a jury and be fair and impartial.” (R. 455.)
E.P. told the circuit court ‘ that she thought she could listen to the evidence and apply the law in an unbiased and unprejudiced way. Accordingly, there was no error in the circuit court’s decision to leave E.P. on-the venire. See Thompson, supra.
2.
Wimbley next asserts that the circuit court committed error because it did not remove veniremember J.S. for cause. This Court disagrees.
J.S. stated during voir dire that she knew Wheat from going into Harris Grocery on an almost daily básis. 'J.S. told the circuit court that she would be able to “put aside that relationship with Mr. Wheat and render a fair verdict based-only on the law and the evidence that [came to her] in the courtroom.” (R. 99.) J.S. later nodded when asked by the circuit court if she “would be able to deal with that and still serve on a jury and be fair and impartial.” (R. 455.) Accordingly, the circuit court did not err by failing to remove J.S. for cause. See Thompson, supra.
3.
Wimbley - also contends that the circuit court committed error because it did not, remove veniremember J.T. for cause. This Court disagrees.
During jury selection,- J.T. stated that she knew Wheat from patronizing Harris Grocery and that she and Wheat had been Mends. J.T. told the circuit court that she would be able to set aside her relationship with Wheat “and render a fair verdict based only dn the law and the evidence that’s presented to [her] in the courtroom.” (R. 102.)
J.T. indicated that she could disregard herí relationship with Wheat and render a fair verdict based on the evidence and law *216 that would be presented in the case. There was no error in the circuit court’s decision to leave J.T. on the venire. See Thompson, supra.
4.
Wimbley also argues that the circuit court committed error because it did not remove veniremember J.D. for cause. This Court disagree^.
During individual voir dire, J.D. informed the circuit court that he knew Wheat from having gone into Harris Grocery on “a few occasions.” (R. 106.) Under questioning by the circuit court, J.D. stated that he would “be able to put aside any relationship or friendship that [he] might have had with Mr. Wheat and render a fair verdict based only on the evidence, and the facts, and the law that came to [him] in the courtroom.” (R. 107.) J.D. indicated that he could disregard his association with Wheat and render a fair verdict based on the evidence and law that would be presented in the case. The circuit court did not commit error in not removing J.D. for cause. See Thompson, supra.
5.
Wimbley asserts that the circuit court erred in not removing veniremember W.D. for cause. This Court disagrees.
W.D. informed the circuit court that he knew Wheat from going into Harris Grocery and because he had “serviced [Wheat’s insurance] account a couple of times.” (R. 109.) W.D. also said that he had helped Wheat’s family members after Wheat’s death but that he would “be able to render a fair and impartial verdict” if he were selected to serve on the jury. (R. 308-09.)
W.D. indicated that he could disregard his association with Wheat and Wheat’s family and render a fair verdict based on the evidence and law that would be presented in the case. Therefore, the circuit court did not commit error in not removing W.D. for cause. See Thompson, supra.
6.
Wimbley next contends that the circuit court committed error because it did not remove veniremember C.K. for cause. This Court disagrees.
During individual voir dire C.K. said that she knew Wheat from seeing him at the church they attended and from shopping at Harris Grocery. C.K. also told the circuit court that she had known Wheat’s sister for 10 years.
The record demonstrates that, after C.K. informed the circuit court that she knew Wheat, she told the circuit court that she did not think she could “put aside [her] relationship with Mr. Wheat and render a fair verdict based only on the law and evidence that [she would] hear in the courtroom.” (R. 88.) The following then occurred:
“[THE COURT]: If you were seated on this jury, if you are selected, would you be able, in an unbiased and unprejudiced way, would you then able to sit over there and listen to the law, evidence and facts and render a verdict based only on that and not on your relationship with Mr. Wheat?
“[C.K.]: Yes, I could, but it would be hard.
“[THE COURT]: Okay. So, is your answer that you could?
“[C.K.]: Yes.”
(R. 88-89.)
After C.K. told the circuit court about her relationship with Wheat’s sister, the following occurred:
“[THE COURT]: Would that have any effect on you sitting in this case?
“[C.K.]: I don’t think so.
*217 “[THE COURT]: Could you listen to the evidence and listen to the testimony?
“[C.K.]: I could listen to the evidence.
“[THE COURT]: Could you render a verdict that you feel is. fair, based solely upon what you hear from the witness stand and the instructions from the Court, and put aside the friendship and your knowledge of his sister, could you do that?
“[C.K.]: Yes.”
(R. 400.)
Because C.K. told the circuit .court that she could disregard her association with Wheat and render a fair verdict based on the evidence and the law that would be presented in the case, the circuit court did not commit error in not removing her for cause. See Thompson, supra.

r.

Wimbley argues that , the circuit court eomniitted error because it did not remove veniremember P.O. for cause. This Court disagrees.
Veniremember P.O. stated during individual voir dire that he knew Wheat from having grown “up in the community” and that he went to church with him. (R. 454.) P.O. nodded when asked by the circuit court whether he “would be able to deal with that and still serve on a jury and,be fair and impartial.” (R. 455.)
P.O. indicated that he could disregard his association with Wheat and render -a fair verdict based on the evidence and law that would be presented in the case. There was no error in the circuit court’s decision not to remove him for cause. See Thompson, supra.
8.
Wimbley contends that the circuit court committed error because it did not remove veniremember We.Wi, This Court disagrees.
During jury selection, We.Wi. told the circuit court that he did not know Wheat but had worked with Wheat’s brother for •35 years. Because of that relationship, ,We.Wi. did not “want to be put'in [the] position” of having to announce that he had voted that Wimbley was innocent. (R. 542.) He then told the circuit court that he “could ■ do it”, if he were selected to serve on the jury. (R. 543.)
The record demonstrates that We.Wi. could eliminate any influence from his relationship with Wheat’s brother. There was no error in thé circuit court’s decision to not remove We.Wi.- for cause. See Thompson, supra.
9,
In another section of his brief, Wimbley seems to imply that venire-member Wi.Wa. should have been removed-for cause because Wheat was one of Wi.Wa’s uncle’s friends and his uncle had told him about Wheat’s death.
During jury selection, Wi.Wa. told the circuit court that he had heard about Wheat’s murder and that his uncle had been friends with Wheat. Wi.Wa. also told the circuit court that his having heard about the death of his uncle’s friend would not “affect [his] ability to listen to the evidence and base [his] verdict on the evidence and not what [he had] heard.” . (R. •504.)
Because the record demonstrates that Wi.Wa.’s ability to base his verdict on the evidence that would be presented in the case would not have been affected by what he had heard about his uncle’s friend, thére was no error in the circuit court’s decision to leave' Wi;Wa. on' the venire. See Thompson, supra.
D.
Wimbley next contends that the circuit court erred in not removing for cause “oth *218 er jurors who had close connections to employees of the prosecutor’s office.”[10] (Wimbley’s brief, -at 46.) Those venire-members are: C.B., F.B., A.D., W.D., R.G., L.H., H.J., We.Wi., K.J.F., R.J., T.T., J.T., arid C:Y. In a related argument, Wim-bley argues that “the trial court failed to strike members of the-venire with family ties to employees of the prosecutor’s office (although not to the individual prosecutors trying the case).” (Wimbley’s .brief, at 48.) Those venireniembers are: J.B., L.B., C.B., S.G., and T.H. Wimbley also asserts that “[a]t least ten veniremembers knew Ferrell Grimes” but mentions R.G. as £he only member of the venire who should have been struck for cause on this basis.
1.
Although Wimbley argues that venire-members C.B„ F.B., A.D., W.D., R.G., L.H., H.J., We.Wi, K.J.F., R.J., T.T., J.T., and C.Y. should have been removed for cause due to their connections .-.with employees of the district attorney’s office, he did not raise a challenge to any' of them on this ground. before the circuit court. Therefore, our review is for plain error only. See Rule 46A, Ala. RÁpp. P.
a.
Veriiremember C.B. -told the circuit court that, although he had used the services of a law -firm whose’ members serve as assistant district attorneys and had grown up with one member of that firm, those facts would not “in any way affect [his] ability to • sit as a fair and impartial juror in th[e] case and ... render a verdict based solely on the - evidence.” (R. 223.) Therefore, the circuit court did not commit error, plain or otherwise, in leaving C.B. on the venire. See Thompson, supra.
b.
During jury selection, venire-member F.B; stated that she had been represented in a divorce case by an assistant district attorney and that another assistant district attorney was a former brother-in-law but-that those relationships would not “in any way affect, [her] ability to sit as a fair and impartial juror in [the] case and render a verdict based on the evidence.” (R. 222.) Therefore, it was not error, plain or otherwise, for the. circuit court to not remove F.B. for cause. See Thompson, supra.
c.
. .Veniremember A.D. told the circuit court that, even though she and her husband had used the,services of an assistant district attorney and that another assistant district attorney was a close friend Of her family, those associations would not cause her “to be [un]able to reridér a fair and impartial verdict in th[e]'case if [she] were selected as a juror.” (R. 298.) Therefore, there was no error; plain or otherwise, in the* circuit court’s decision to leave A.D. on the venire. See Thompson, süpra. .
d.
 Venireftiember W.D. told the circuit court during jury selection that he had served on boards for which some assistant district attorneys had done work and that those individuals had done some personal work for him. W.D. stated ■ that those associations would “absolutely not” “cause [him] any difficulty in being able to render a fair verdict if [he] were chosen [to sit] on the jury in th[e] case.” (R. 298.) W.D. also told the circuit court that friendships *219 he had with other assistant district attorneys would not “cause [him] a problem.” (R. 299.) Therefore, the circuit court did not commit error, plain or otherwise, when it did not remove W.D. for cause. See Thompson, supra.
e.
Veniremember R.G. told the circuit court during jury selection that an assistant district attorney had “represented [her] in a child support and adoption matter about fifteen years ago.” (R. .296,) She also .said that the representation would not cause her “to be [un]able to render a fair, and impartial verdict based only on the law and evidence as, presented in the court if [she] were selected as a juror.” (R. 296.) Therefore, there was no error, plain or otherwise, in the circuit court’s decision to leave R.G. on the venire. See Thompson, supra.
f.
During jury selection, L.H. informed the circuit court that an assistant district attorney had helped him with some business transactions, but he also said that the work would have no affect on him in the case. ' Therefore, it was not error, plain or otherwise, for the circuit court not to remove L.H. for 'cause. See Thompson, supra.
&
Veniremember H.J. told the. circuit court that a member of the district attorney’s staff “does work for [him]” but that the relationship would have no affect on him in the case. (R. -395.) Therefore, it was not error for the circuit court, to leave H.J. on the venire. See Thompson, supra.
h.
Veniremember We.Wi. indicated that, although he - had used the services of assistant district attorneys, that fact would not “in' any way affect [him] in th[e] case or‘prevent [him] from sitting as a fair -and impartial juror and rendering a decision solely based upon what [he] hear[d] from the witness stand and from what the Judge [said].” (R. 520.) Therefore, the circuit court did not commit error, plain or otherwise, when it did not remove We.Wi. for cause. See Thompson, supra.
i.
Veniremember K.J.P. told the circuit court that an assistant district attorney had represented her husband during a custody proceeding and that she. was good friends with another district attorney. The circuit court asked K.J.F. whether “either of those connections or relationships [would] cause [her] not to be able to render a fair and impartial verdict if [she] were selected as a juror.” (R. 297-98.) K.J.F. said that they would not. Therefore, it was not error, plain or otherwise, for the circuit court to leave K.J.F. on the venire. See Thompson, supra.
j.
Veniremember R.J. informed the circuit court that some of his family members had used an assistant district attorney to draft -wills and other related documents. The circuit court asked R.J. whether the use of the services of an assistant district attorney by some of his family members would “affect [him] in any way in th[e] case,” and R.J. stated that it would not. (R. 395.) Therefore, the circuit court did not commit error, plain or otherwise, when it did not remove R.J. for cause. See Thompson, supra.
*220 k.
During jury selection, T.T. indicated that his brother had used an assistant district attorney during divorce proceedings. He also indicated that the fact that his brother had used the services of an assistant district attorney would not “in any way affect [him] in th[e] case or prevent [him] from sitting as a fair and impartial juror and rendering a decision solely based upon what [he] hear[d] from the witness stand and from what the Judge [said].” (R. 520.) Therefore, it was not error, plain or otherwise, for the circuit court to leave T.T. in the venire. See Thompson, supra.
l.
Veniremember J.T. informed the circuit court that her son had used the services of an assistant district attorney for a divorce. J.T. further indicated that her son’s use of an assistant district attorney would not “in any way affect [her] in th[e] case or prevent [her] from sitting as a fair and impartial juror and rendering a decision solely based upon what [she would] hear from the witness stand and from what the Judge [said].” (R. 520.) Therefore, the circuit court did not commit error, plain or otherwise, when it did not remove J.T. for cause. See Thompson, supra.
m.
During jury selection, C.Y. informed the circuit court that an assistant district attorney had done work for her parents and indicated that the work would not affect her in the case or “prevent [her] from sitting as a fair and impartial juror and rendering a decision solely based upon what [she would] hear from the witness stand and from what the Judge [said].” (R. 520.) Therefore, it was not error, plain or otherwise, for the circuit court to leave C.Y. on the venire. See Thompson, supra.
2.
Wimbley argues ' that veniremembers J.B., L.B., C.B., S.G., and T.H. should have been removed for cause due to family ties they had with employees of the district attorney’s office. Wimbley contends that, “[although the kinships [sic] ties were not close enough to automatically disqualify [the veniremembers] from service, the trial court failed to thoroughly investigate whether they could serve fairly.” (Wim-bley’s brief, at 48.) Wimbley did not challenge these ' veniremembers for cause; therefore, our review is limited to plain error. See Rule 45A, Ala. R.App. P.
Section 12-16-150, Ala.Code 1975, lists general grounds for challenging veniremembers for cause. Section 12-16-150(4), Ala.Code 1975, establishes that a “good ground” for challenging a venire-member is that “he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of civil law, either with the defendant or with the prosecutor or the person alleged to be injured.” This statute does not require the removal of veniremembers related to people employed by the prosecutor’s office but not involved in the prosecution of the case on which the veniremember might sit. See Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007).
a.
Veniremember J.B. told the circuit court that he was a third or fourth cousin of the father of a district attorney’s office employee. Because no evidence established that the employee of the district attorney’s' office to whom J.B. referred was involved in prosecuting Wimbley, the circuit court did not commit error, plain or *221 otherwise, in leaving J.B. on the venire. See Brown, supra.
b.
Veniremember L.B. stated that she knew that, she was related to a member of the district attorney’s office but that the connection was “not real close.” (R. 225.) L.B. indicated that she did not “even know ;how close.” (R. 225.) There was no evidence indicating that L.B. was related to anyone in the district attorney’s office closely enough to justify a challenge for cause. Nor was there any evidence establishing that the employee to which L.B. referred was involved in the prosecution of Wimbley. Therefore, the circuit court did not commit error, plain or otherwise, in ieaving L.B' on the venire. See Brown, supra.
c.
During voir dire, C.B. informed the circuit court that he was related to the husband of an employee of the district attorney’s office. No evidence was before the circuit court indicating that the employee to whom C.B. referred was involved in the prosecution of Wimbley. Therefore, the circuit court did not commit error, plain or otherwise, in leaving C.B. on the venire. See Brown, supra.
d.
Veniremember S.G. told the circuit court that he had a cousin who worked for the district attorney. He also said that the kinship would..not “cause [him] a problem.” (R. 301.) No evidence established that the cousin to whom S.G. referred was involved in prosecuting Wimbley. Therefore, the circuit court did not commit error, plain or otherwise, in leaving S.G. on the venire. See Brown, supra.
e.
During jury selection, venire-member T.H. stated that an employee of the district attorney’s office was her son’s mother-in-law. She also told the circuit court that the relationship would have no effect on her. Because T.H. was not sufficiently related to an employee of the district attorney’s office to justify her removal and because there was no evidence that the employee to whom she referred was involved in prosecuting Wimbley, the circuit court did not commit error, plain or otherwise, in leaving her on the venire. See Brown, supra.; see also Thompson, supra.
f.
In his brief, Wimbley also seems to imply that Wi.Wa. should have been removed for cause because one of his cousins was an assistant district attorney. The record does not establish that the cousin to whom Wi.Wa. referred was involved in prosecuting Wimbley. Therefore, the circuit court did not commit error, plain or otherwise, in leaving Wi.Wa. on the venire. See Brown, supra.
3.
Wimbley contends that R.G. should have been removed for cause due to her relationship with Deputy Grimes.[11] Wimbley did not challenge R.G. in the circuit court; therefore, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
The record reflects that, during jury selection, R.G. stated that she had *222 known Deputy Grimes throughout her life. She also stated that her acquaintanceship with Deputy Grimes would not cause her “to be [un]able to render a fair and impartial verdict if [she was] selected” to be a juror. (R. 318.) Therefore, it was not error, plain or otherwise, for the- circuit court to leave R.G. on the venire. See Thompson, supra.
4.
In his brief, Wimbley seems to suggest that Wi.Wa. should have been struck,for cause because “his brother was a deputy sheriff for the Washington County Sheriffs Department in Chatom.” (Wimbleys brief, at 38.) Wimbley did not challenge Wi.Wa. on this ground. Therefore, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
Wi.Wa. stated during jury selection that his brother had worked in the past as. a police officer in Chatom and that he was then working as a deputy sheriff for the Washington County Sheriffs Office. When -asked, along with -two other veniremembers whose relatives had been employed in law enforcement, whether the fact that those veniremembers had “family members that are currently working as a [sic] police officers, or may have had family members that worked as a police officer in the past” would affect them in the case, the record shows.that there was “No.response.” (R. 522.)
Nothing in.the record demonstrates that Wi.Wa. would not have been able to consider. Wimbley’s case fairly and impartially. Therefore, there was no error, plain or otherwise, in the circuit court’s decision not to remove him for cause. See Thompson, supra.
III.
Wimbley next contends that the State used its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This Court disagrees.
This Court has explained:
“In evaluating a Batson claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
‘“First, a defehdant must make a pri-ma facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97, 106 S.Ct. 1712[, 1723 (1986) ]. Second, if that showing has been made, the' prosecution must offer a race-néutral basis for striking the juror in question. Id,, at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.’
“537 U.S. at 328-29, 123 S.Ct. 1029.
“Recently, in Thompson v. State, 153 So.3d 84, 123 (Ala.Crim.App.2012), this Court explained:
“ ‘After a prima facie case is established, there is a .presumption that the peremptory challenges were used to discriminate against black jurors. Batson [v. Kentucky ], 476 U.S. [79,] 97, 106 S.Ct. [1712,] 1723 [ (1986) ]. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the-particular case to be tried, and which is nondiseriminatory; Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for causé. Ex parte Jackson, [516 So.2d 768 (Ala.1986) ].’
*223 “ ‘ “Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“ ‘ “ ‘Within the context of Batson, a “race-neutral” explanation “means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). “In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are .true, the challenges violate the Equal .Protection Clause as a matter of law.” Id.
“[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within the trial judges’s province.’ ” Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.’
“ ‘ “Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).”
“‘Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
“““When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001).' ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.’ Woods v. State, 789 So.2d 896, 915 (Ala.Crim. App.1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with th¿ attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘ “ ‘Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context becaüse, as we noted in Batson, the finding will “largely turn on evaluation of credibility” 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing oh that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.’
“‘“Hernandez v. New York, 500 U.S. 352, 365 (1991).”
‘“‘Doster v. State, 72So.3d 50, 73-74 (Ala.Crim.App.2010).
“‘“[W]hen more than one reason was given for striking some venire-members, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect.'' See Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App.1989).’
“ ‘Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). ‘“So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.’ ” Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
*224 “ ‘ “Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.” Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). “A determination regarding a moving party’s showing of intent to discriminate under Batson is “‘a pure issue of fact subject to review under a deferential standard.” ’ Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).” Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). “The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.” Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).’
“Thompson, 153 So.3d at 124.”
Wilson v. State, 142 So.3d 732, 753-54 (Ala.Crim.App.2010) (opinion on return to remand).
The record in the instant case demonstrates that, following the striking of the jury, Wimbley made a Batson motion, alleging:
“[I]n this case there were a total of six on the panel that were African Americans. The State has struck four of those six. There were two males, four females. The State struck three of the four black females which would represent seventy-five percent of the black females on the panel. They struck one of the two black males, which therefore, represents a strike by the State of fifty percent of the black males on the panel, leaving only two of the four as jurors in this case.”
(R. 577-78.)
The circuit court found that Wimbley had made “a prima facie case that these [peremptory] strikes were possibly made for racial reasons” and asked the State to provide race-neutral reasons for the strikes. (R. 578.) The State provided reasons for each strike it had made of a black veniremember. After hearing from the State and giving Wimbley an opportunity to respond to the State’s reasons for the strikes, the circuit court found “that there were, in fact, race neutral reasons” for the strikes and denied Wimbley’s motion.
A.
Wimbley asserts that the circuit court failed to consider the strength of the prima facie case of discrimination he alleged in this case.
In Ex parte Bankhead, 625 So.2d 1146 (Ala.1993), a case on which Wimbley relies, the Alabama Supreme Court stated:
“Initially, we note that the State’s burden of rebutting a defendant’s prima facie case of discrimination increases in proportion to the strength of the prima facie case. Ex parte Bird, 594 So.2d 676, 680 (Ala.1991). Here, the State’s burden is heavy because of the strength of Bankhead’s prima facie case of discrimination. This is so because the State struck 8 of the 10 black venire-members; the lead prosecutor, Bob McGregor, has been found to have systematically excluded black venire-members in violation of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), in Jones v. Davis, 835 F.2d 835 (11th Cir.1988), cert. denied, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988); and the State had failed to conduct any meaningful voir dire of the excluded black venire-members. All this evidence corresponds perfectly to the factors that this Court enunciated in Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987), for determining whether the defendant has es *225 tablished a prima facie case of discrimination.”
Ex parte Bankhead, 625 So.2d at 1147.
In the instant case, the prima facie case was not as strong as that in Ex parte Bankhead. There was no evidence before the circuit court that anyone prosecuting Wimbley had “been found to have systematically excluded black veniremembers.” Id. Nor had the State “failed to conduct any meaningful voir dire of the excluded black veniremembers.” Id. The circuit court found “that the defense [had] made out a prima facie case that [the State’s] strikes were possibly made for racial'reasons.” (R. 578.) Thus, the record demonstrates that the circuit court adequately considered the strength of the prima facie case, and Wimbley’s argument is without merit.
B.
Wimbley next contends that the circuit court incorrectly found that the State had articulated sufficiently race-neutral reasons for its strikes and, therefore, erroneously denied his Batson motion. Wimbley specifically argues that the prosecutor’s peremptory-strikes demonstrated disparate treatment in regard to venire-members: 1) who knew members of Wim-bley’s and Crayton’s families; 2) who had connections to State’s witnesses; 3) whose family members had been convicted of crimes; 4) who expressed opposition to the death penalty; and 5) who had familial connections with the parties.
The record .demonstrates that the State used peremptory strikes to remove black veniremembers S.H., M.S., S.G., and A.W.
The prosecutor told the circuit court that he struck S.H. because of her opinion of the death penalty, because of her failure to express her opinion during voir dire, because “she admitted that she had been charged with promoting prison contraband,” and because she had known Wim-bley’s brother' and sister. (R. 579.) The prosecutor stated that he struck M.S. because he knew Wimbley, because he knew Wimbley’s mother “from officiating basketball games,” because he knew the flaneé of Wimbley’s mother, because he had worked with or'dated Crayton’s mother, and because Crayton’s mother was currently dating one of his brothers-in-law.[12] (R. 582.) The prosecutor told the circuit court that he struck S.G. because he was unsure whether she was “outside the prohibited degree of kinship [with Wimbley].”[13] (R. 583.) The prosecutor also informed the circuit court that S.G. had stated that she was friends with Wimbley’s sister, that she knew one of Wimbley’s brothers, and that her stepson was related to Wimbley’s other brother. The prosecutor told the circuit court that he struck A.W. because she had written' on - her juror questionnaire that she was “[n]ot okay with [the death penalty],” because she had a brother who had been prosécuted for a criminal offense; and because she knew the flaneé of Wim-bley’s mother, other Wimbley family members, Deputy Grimes, and Ira Roberts, who is Crayton’s stepbrother and who was scheduled to testify at trial. (R. 581.)
*226 Defense counsel 'responded to the State’s reasons for the strikes, and the circuit court denied the motion.
1.
Wimbley argues that the State disparately treated black and white venire-members who knew members of Wim-bley’s family and Crayton’s family. In his brief on this iss.ue, Wimbley alleges that the “disparate treatment of white and African-American veniremembers is obvious.” (Wimbley’s brief, at 58.) .This Court does not agree.
“This Court has previously held that ‘[t]he strike of a potential juror because he knew the appellant or the appellant’s family is a valid race-neutral reason that does not violate Batson v. Kentucky, supra. Brown v. State, 623 So,2d 416 (Ala.Cr.App.1993); Williams v. State, 620 So.2d 82 (Ala.Cr.App.1992).’ ” '
Riley v. State, 166 So.3d 705, 725 (Ala.Crim.App.2013) (quoting Carroll v. State, 701 So.2d 47, 52 (Ala.Crim.App.1996)).
Of the four black veniremembers peremptorily struck by the State, only S.G. was struck solely on the basis .that she knew members of Wimbley’s or Crayton’s family. In addition to knowing members of Wimbley’s family, S.H. was. also struck because of her opinion on the death penalty and her conviction for promoting prison contraband. M.S. knew Wimbley, not just members of his and Crayton’s family. A.W. was also struck because of her opinion on the death penalty and the fact that her brother had been prosecuted for a criminal offense.
Although some white veniremembers also knew members of Wimbley’s family, the record established that their contacts were not as numerous or substantial as the contacts of the bláck veniremembers peremptorily struck by the State. The circuit court did not err in concluding that the State articulated a race-neutral reason for its strikes of S.H., M.S., S.G., and A.W., and Wimbley is due'no relief on this claim.
2.
Wimbley next asserts that the prosecutor exhibited disparate treatment of black and white veniremembers ip peremptory strikes made based on connections veniremembers had to State’s witnesses.
In support of. this issue, Wimbley correctly points out that A.W. was struck, in part, because she knew Ira Roberts, a State’s witness, and then cites the record to establish that white veniremembers who knew other State’s witnesses were not peremptorily struck by the State. Roberts, however, was more than just a State’s witness; during his testimony, Roberts stated that Crayton was his stepbrother. None of the white veniremembers to whom Wimbley refers in support of his argument on this issue stated that they had a familial relationship with Wimbley or Crayton.
A connection between a potential juror and a codefendant is a valid race-neutral reason for a strike that does not offend Batson. See, e.g., Ex parte Lynn, 543 So.2d 709, 711 (Ala.1988) (one venire-member was a “classmate of the co-defendant as well as having a child by the co-defendant’s brother”). Because the circuit court correctly found that the State articulated a race-neutral reason for its strike of A.W., Wimbley is due no relief on this claim.
3.
Wimbley also contends that the State disparately treated black and white veniremembers ’ whose family members had been convicted of a crime.
Although the State did tell the circuit court that it had struck A.W., in part, because she had a brother who had *227 been convicted of a criminal offense, that was not the only reason it gave for Striking her. The State also said that it had struck her because of her opinion on the death penalty and her relationships with Wim-bley’s family members and Crayton’s stepbrother. The other concerns given by the State were inapplicable to the two white veniremembers who had a friend or family member, who had been convicted of a crime and who were not struck by the State. Further, a potential, jurpr’s view on the death penalty may constitute a race-neutral reason for a peremptory strike. See, e.g., Floyd v. State, 190 So.3d 987, 994 (Ala.Crim.App.2012) (opinion on return to second remand).
The circuit court did not commit error in concluding that the State articulated race-neutral reasons for its strike of A.W., and Wimbley is due no relief on this issue.
4.
Wimbley next argues that the prosecutor demonstrated disparate treatment between' black and white venire-members in peremptory strikes based on veniremembers’ opposition to the death penalty.
As Wimbley notes, in her questionnaire S.H. wrote: “Honestly, I just really hate loss of life, whether taken by someone or the penalty of death," but I understand some crimes are punishable by the death penalty.” (S.H.’s Juror Questionnaire, at 2.) During voir dire, the panel on which S.H. sat was asked whether anyone had “a religious or a moral opposition to the imposition of the death penalty,” and she did not respond. (R. ’264.) Several other questions were asked regarding the death penalty, and S.H. never responded to any of them.
A lack of response to questions can be a race-neutral reason for striking a prospective juror. See, e.g., Gorum v. State, 671 So.2d 764, 766 (Ala.Crim.App.1995).
Although the prosecutor did give S.H.’s answer on her juror questionnaire’as one reason for peremptorily striking her, he also noted that during voir dire, in “regard to the death penalty, she never answered a question [raised about the death penalty].” (R. 579.) S.H.’s answer on her juror questionnaire and her lack of response to questions regarding the ' death penalty that were raised on voir dire certainly would have been of concern to the State. The circuit court did not err in finding that the State provided a sufficiently race-neutral reason for the strike of S.H., and Wimbley is due no relief on this issue.
5.
Wimbley also asserts that the State disparately treated black and white veniremembers who had distant familial connections with the parties.
Wimbley specifically argues that, although the State struck black venire-member S.G., in part, due to her connection with Wimbley’s family members, it did not strike white' veniremembers who had connections to the district attorney’s office and Wheat’s family. Wimbley does not argue, nor does the'record establish, that the white veniremembers he references in his argument on this issue had any connection to Wimbley’s family members. As we noted above, it is a race-neutral reason to strike a prospective juror who knows the defendant or a member of his family. Moreover, it would certainly be reasonable for the State to assume that venire-members with connections to the district attorney’s office and Wheat’s- family would be more sympathetic toward the prosecution than the defense. There was no error in the circuit court’s- finding that the State had provided a race-neutral reason for *228 striking S.G., and Wimbley is due no relief on this claim.
IV.
Wimbley. argues that the prosecutor misstated the law and misled the jury by stating that an unintentional murder could rise to the level of capital murder. Specifically, Wimbley argues that a capital-murder conviction requires the State to prove specific intent to kill; therefore, the prosecutor’s argument that an unintentional murder can be capital murder was erroneous. Wimbley did not object to the prosecutor’s statements; therefore, this Court’s review is. limited to plain error only. See Rule 45A, Ala. R.App. P.
The record demonstrates that, during jury selection, the prosecutor presented panels of the venire a factual scenario of someone entering a convenience store with the intent to rob the store and who, because of nervousness, fires a gun and kills someone. The prosecutor asserted that such a scenario would be capital murder.
During penalty-phase closing argument, the prosecutor reminded the jury:
“I talked to some of /all in voir dire about different ways that a person can be convicted of capital murder and murder during the course of a robbery. I talked to you about how the guy that walks in the 7-11 [convenience store] and is nervous, and he pulls a gun out, he’s waving the gun up in the air, the gun accidentally goes off and kills somebody at the fountain machine. And then he robs store.
“Well, ladies and gentlemen, under our law that’s capital murder. That’s murder in the course of a .robbery.. And in-that case life without the possibility of parole might be the proper punishment. But that is not this case. That is totally different. And in this case the crime was planned, premeditated.”
(R. 1073.)
Under § 13A-5-40(b), Ala. Code 1975, “murder” as used in § 13A-5-40(a)(2), Ala.Code 1975; and § 13A-5-40(a)(9), Ala.Code 1975, is defined in § 13A-6-2(a)(l), Ala.Code 1975. Section 13A-6-2(a)(l), Ala.Code 1975,- provides: “A person commits the crime of murder if he or she [w]ith intent to cause the death of another person, ... causes the death of that person or of another person.”
“Alabama appellate courts have repeatedly held that, to be convicted of capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill. E.g., Gamble v. State, 791 So.2d 409, 444 (Ala.Crim.App.2000); Flowers v. State, 799 So.2d 966, 984 (Ala.Crim.App.1999); Duncan v. State, 827 So.2d 838, 848 (Ala.Crim.App.1999).”
Ziegler v. State, 886 So.2d 127, 140 (Ala.Crim.App.2003).
“Initially, we note that the trial court instructed the jury that statements made by the attorneys were not evi.dence. We presume that the jury followed the trial court’s instructions. See Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995). In judging a prosecutor’s closing argument, the standard is whether the argument ‘ “so infected the trial with unfairness as to make the resulting conviction a denial of due process.”’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
“ ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of *229 this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of' counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).’
“Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
‘““[djuring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.” Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). “In evaluating allegedly prejudicial remarks by the prosecutor 'in closing argument, ,.. each case must' be judged on its own merits,” Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). “In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.” Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). “To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.” Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).’
“Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).”
Sneed v. State, 1 So.3d 104, 138-39 (Ala.Crim.App.2007).
In the instant case, the prosecutor’s statements regarding unintentional murder were incorrect. However, any error in the prosecutor’s statement was harmless. Rule 45, Ala. R.App. P. Here, the. circuit court instructed the jury after it was sworn that “what the lawyers say is not evidence.” (R. 586-87.) Later, the circuit court, instructed the jury that, to find Wimbley guilty of capital murder, the jury must, find that he “intended to kill Connie Ray Wheat.” (R. 972, 975.) The circuit court repeatedly instructed the jury that “the intent to kill must be real and specific.” (R. 976.) Thereafter, the circuit court reminded -the jury “not to consider as evidence ... the arguments of the lawyers .” (R. 978.)
.Moreover, there was no theory of the evidence .in which Wimbley accidentally killed Wheat. The evidence established that Wimbley went in the store with a pistol and a bottle of accelerant. Once *230 inside the store, Wimbley shot Wheat three times. • One bullet struck Wheat in his' right arm and shoulder before exiting his back. Another bullet entered the right side of Wheat’s chest, traveled through his heart, and exited the left side of his chest. The third bullet entered Wheat’s back and exited his chest. After shooting Wheat three times, Wimbley attempted to burn the store and Wheat’s body.
Because the circuit court correctly instructed the jury that it could not convict Wimbley of capital murder ünless it found that Wimbley had the specific intent to kill and because there was no theory from the evidence that Wheat’s death was accidental, the prosecutor’s misstatement of the law did not “so infect[] the trial with unfairness to make the resulting conviction a denial of due process.” Sneed, 1 So.3d at 138 (citations and quotation marks omitted). Accordingly, this issue does not rise to the level of plain error and does not entitle Wimbley to any relief.
V.
Wimbley' next argues' that prosecutor committed miscónduct when he told the jury that the circuit court had already determined that Wimbley voluntarily gave the statement to law-enforcement officers. He also argues that the. circuit court erroneously failed to instruct the jury to consider the circumstances of his statement when determining what weight to give that statement. ' Wimbley did not object to thé prosecütor’s statement or request a jury instruction regarding that statement. ' Therefore, this Court’s review is limited to plain error only. Rule 45A, Ala. R.App. P.
• Before closing arguments in the guilt phase, the prosecutor made a motion in limine “to prevent or prohibit the defense from -referring to the statement of the defendant as being coerced or involuntary, due to [the] fact that we have had a ruling on that statement by the Court.” (R. 916.) Defense counseít'old the circuit court that he “should have an opportunity to argue the context in. which the statement was given.” (R. 917.) The circuit court told .defense counsel that it would allow both parties “to comment on” the issues that they wanted to raise about thé statement. (R. 918.)
During guilt-phase closing argument, defense counsel stated to the jury:
“Yes, you heard his confession. You heard his tape. But,- again, you also at the beginning heard him talking about being isolated in the jail. Being isolated from the general population. And that is repeatedly brought up in that. You tell us, wé’ll get you out of the hole, so to speak.
“The Deputy testified about the hole. He testified about how many years he’d been working with the Sheriffs Department. But he couldn’t tell us whether there was lights in this' cell, whether there was a bed in this cell, whether there was water in this cell. All we know is this location, Corey Wimbley had been in there four days, four days. Think about that, ladies and gentlemen, in a location that , nobody can confirm thére was lights, water, a bed. Think of the effect that can have’ on a person.
■ ‘You also heard the testimony that he had asked for an attorney before he gave this statement. He had not been given an attorney. Think about those things when you weigh his statement. Think about that. That’s got to have an impact here. That’s got to have an effect.
“Also, think about most of those-questions were leading questions,-you know. And he responded, but they were leading questions. They were leading him *231 into certain answers that they wanted to get. Think of those things.”
(R. 946-47.)
In rebuttal, the prosecutor argued:
“And they want you to just totally discount his confession, because that, alone, that one piece of evidence, alone, is enough for you to find him guilty of capital murder. That confession is admissible. If it were something wrong with it, if it had been deemed involuntary or coerced, the Judge would have kept that out. You wouldn’t have, never heard that. He determines what’s legal evidence and what’s not. And he let it in because it is legal evidence.” ■ ■
(R. 955-56.)
“It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible.” Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985). Similarly, it is improper for the State to argue that the issue of the voluntariness of a confession has already been resolved by the court and, thus, should not be considered by the jury. See Garcia v. State, 125 So.3d 260, 263 (Fla.Dist.Ct.App.2013). The reason being that:
“whether a confession was voluntary rests initially with the trial court; once the trial judge makes the preliminary determination that the confession was voluntary, it then becomés admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight-and credibility to be given the confession. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976).”
Ex parte Singleton, 465 So.2d at 446 (emphasis in original). The Alabama Supreme Court has explained:
“‘We are clear to the conclusion that , whenever a motion is made for the question of the voluntariness of the confession to be determined outside the presence of the jury, the motion should be granted.' In such a hearing, the trial judge sitting alone should make a determination upon a proper record .of .the issue of volun-tariness..-.. If the confession is held ■voluntary and. admitted, the' jury’s consideration of that confession and surrounding circumstances shall proceed in accordance with the “Orthodox” procedure, that is, the jury considers the voluntariness ' as affecting the. weight or credibility of the confession.’ ”
Ex parte Singleton, 465 So.2d at 446-47 (quoting Duncan v. State, 278 Ala. 145, 176 So.2d 840, 859 (1965)) (emphasis added).
Here,-the prosecutor informed the jury that the trial judge had already determined that Wimble/s confession was voluntary and admissible, and the circuit court failed to instruct the'jury to consider the voluntariness of Wimbley’.s confession when deciding what weight to give it. The prosecutor’s- statement and. the circuit court’s failure to instruct the jury were -error; however, under, the facts, of this case, those errors do not rise- to the level of plain error. Rule 45A, Ala. R.App. P.
“Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that'the error adversely affected the outcome of the trial,” Wilson v. State, 142 So.3d 732, 751 (Ala.Crim.App. 2010). For a number of reasons, Wimbley has failed to show that the prosecutor’s comment on and the circuit court’s failure to instruct the jury on the voluntariness of his confession adversely affected the outcome of his trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error). First, the pros *232 ecutor did not argue that the jury'could not consider the voluntariness of Wim-bley’s statement. Rather, he stated that the jury- should not completely discount the confession because it was admissible evidence. Nothing in the prosecutor’s statement precluded the jury from considering the circumstances in which Wimbley confessed when- deciding whether the statement was credible. See Ex parte Singleton, 465 So.2d at 446-47 (recognizing that the jury considers issues- relating to the voluntariness of a confession when deciding whether the statement was credible).
Next, the information Wimbley provided in his statement was largely corroborated by other evidence, such as eyewitnesses who- saw Wimbley leaving the scene of the crime, Wimbley’s shoe print in the acceler-ant he used to try to burn the crime scene, and Wimbley’s possession of items stolen during the robbery. Further, in a recorded conversation with his mother, Wimbley reaffirmed that the facts discussed in his confession were “what happened.” (G. 571.) Because Wiiqbley’s confession was corroborated by other evidence, it is very unlikely that the jury would have found it to be a false confession or to have lacked credibility. Finally, as discussed in Part I.C. of this opinion, even without Wim-bley’s statement, the State’s “evidence of [Wimbley’s] guilt [was] ‘virtually ironclad.’” Ex parte Greathouse, 624 So.2d at 211.
For the foregoing reasons, this Court holds that Wimbley failed to meet his burden of establishing that the prosecutor’s statement on or the circuit court’s failure to instruct the jury on the voluntariness of Wimbley’s confession “adversely affected the outcome of the trial.” Wilson, 142 So.3d at 751. Therefore, these errors do not rise to the level of plain error and do not entitle Wimbley to any relief.
VI.
Wimbley next contends that the circuit court improperly allowed a State’s expert witness “to invade the province of the jury on the question of whether Mr. Wimbley was guilty of the arson with which he was charged.” (Wimbley’s. brief, at 72.) Wim-bley did not raise this objection at trial; therefore, this Court’s review is restricted to plain error only. Rule 45A, Ala. R.App. P,
The record . demonstrates that during his direct examination Deputy State Fire Marshal Gary Cartee testified that he concluded that the fire at Harris Grocery had been intentionally set and that the cause of the fire was “[t]he introduction of ignitable liquids onto the scene, set by an open flame, a match.” (R. 799.) Cartee also,told the jury that “[t]he definition of arson is the, intentional setting of fire of a building.” (R. 799.) , Later, on redirect examination Cartee testified that, even though the fire damage, to Harris Grocery was minimal, “the fact there was charring present indicates arson.” (R. 813.)
This Court has explained:
“ ‘Alabama case law has traditionally embraced the principle that a witness, whether expert or lay, cannot give an opinion when such constitutes a legal conclusion or the application of a legal definition.’ Gamble and Goodwin, McElroy’s Alabama Evidence, § 128.07 (6th ed.2009). Rule 704, Ala. R. Evid., states that ‘[tjestimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.’
“However, in discussing Rule 704, Ala. R. Evid., this Court in Henderson v. *233 State, 715 So.2d 863 (Ala.Crim.App.1997), stated:
“‘Rule 704, Ala. R. Evid., provides that “[tjestimony in the form of' 'an opinion or inference otherwise-^admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” However, in the case of expert testimony, enforcement of'this rule has been lax. C. Gamble, Gamble’s Alabama Rules of -Evidence § 704 (1995). We have noted’ previously in Travis v. State, [776 So.2d 819, 849] (Ala.Cr.App.1997), that expert testimony as -to the ultimate issue should be allowed when it-would-aid or assist the trier of fact, and the fact that “ ‘ “a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper.” ’ ” (citations omitted); see also Rule 702, Ala. R. Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact).’
“715 So.2d at 864-65. See also § 12-21-160, Ala.Code 1975 (‘The opinions of experts on any question of science, skill, trade or like, questions are always admissible, and such opinions may be given on the facts as proved by other witnesses.’).”
Albarran v. State, 96 So.3d 131, 167-68 (Ala.Crim.App.2011).
In Henderson, this Court noted that:
“Alabama appellate courts have previously held that it is reversible error to allow an expert to give an opinion as to whether á ñre was intentionally set because such an opinion goes to the ultimate issue in an arson case. See Colvin v. State, 247 Ala. 55, 22 So.2d 548 (Ala.1945), Moreland v. State, 373 So.2d 1259 (Ala.Cr.App.1979); Huffman v. State, 470 So.2d 1368 (Ala.Cr.App.1985); Bolden v. State, 568 So.2d 841 (Ala.Cr.App.1989). This treatment of expert opinion testimony in arson cases has been viewed; as inconsistent with the treatment of expert opinion testimony in other cases. See J. Colquitt, Alabama Law of Evidence (1990) (noting that lay and expert opinion evidence is allowed on issues of handwriting, identity, mental condition, and the value of property, regardless of whether such opinion evidence goes to an ultimate issue in a case). In arson cases, causation is often a complex issue and such expert opinions would be of invaluable assistance to the jury. Furthermore, in many arson cases, whether the fire was intentionally set is not the ultimate issue. See Col-quitt, supra (noting that the ultimate issue is often whether the accused set the fire, and that where the accused admits to setting the fire, there is no issue). We believe that the more appropriate view is that experts in arson cases should-'be allowed to give opinion testimony as to whether a fire was intentionally set if that testimony will aid or assist the jury. This is' consistent with the current 'caselaw concerning opinion testimony by an expert witness.”
Henderson, 715 So.2d at 865.
In his interview with Deputy Grimes, Wimbiey admitted to taking the gasoline into Harris Grocery, but he denied that he was “going to burn the store.” (C. 550.) Wimbiey said that he “wasn’t going to pour it nowhere so it could catch on fire cause [he] knew he had concrete floors so [he] just poured it right there on the concrete.” ■' (C. 550) (errors in original). As such, the ultimate issue was not whether the fire was intentionally set. Accordingly, there was no error, much less plain error, in the admission of Cartee’s testimo *234 ny, and Wimbley is due no relief on this claim.
VII.
Wimbley next argues that the circuit court improperly allowed the State' to present unreliable scientific evidence. Specifically,'hé argues:
“The trial court improperly abdicated its gatekeeping duty to exclude unreliable expert testimony by allowing the State’s expert witness to offer an opinion regarding the presence of gasoline on Mr. Wimbley’s hands and personal effects obtained from him that was admittedly foreclosed by the scientific tests and principles on which the State’s expert was qualified to opine.”[14]
(Wimbley’s brief, at 77.) Wimbley did not raise this argument in the circuit court; therefore, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
 The record demonstrates that during the direct examination of-Sharee Wells, a “forensic scientist of the arson sciences” with the Alabama Department of Forensic Sciences, Wells was qualified as an arson specialist. (R. 850.) Wells testified that “[g]asoline is a blended product, that contains over four hundred compounds.” (R. 861.) She also testified that forensic scientists use the “AS-10 method” to determine whether gasoline is present. (R. 861.) Wells said that if the required “criteria are not present, [forensic scientists] cannot confirm the presence of gasoline, even though [they] may be able to justify why that component isn’t there.” (R. 861.) Wells, stated that in her opinion automobile floor mats and gloves that had been, recovered from Crayton’s car contained “a trace amount of gasoline” even though, it was “missing some of those components.” . (R. 861.) Wells’s- opinion was based on her “training [and] education and [her] research that [she had conducted] over the [previous] , ten years to know that all of those components combined is gasoline.” (R. 861.) On cross-examination, Wells testified that the analyses she conducted on the automobile floor mats and gloves were inconclusive for the presence of gasoline.
At the time of Wimbley’s trial, Rule 702, Ala. R. Evid., provided:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by .knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”[15]
The Alabama Supreme Court has stated:
“In interpreting the standard set forth in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), for determining the admissibility -of expert testimony, we have said, ‘[A] person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the ex *235 pert is testifying.’ Slay v. Keller Indus., Inc., 823 So.2d 623, 626 (Ala.2001). We also stated in Slay that ‘[m]ere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony under , either the “general-acceptance” standard enunciated in Frye or the “scientifically reliable” standard of Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)].’ 823 So.2d at 626.”
Kyser v. Harrison, 908 So.2d 914, 920 (Ala.2005).
The record demonstrates that Wells based her- opinion regarding the substance found on the automobile floor mats and gloves on her training, education, and research. There was no error, much less plain error, that resulted from Wells’s testimony, and Wimbley is due no relief on this claim.
VIII.
 Wimbley next asserts that the circuit court committed error by admitting hearsay testimony. The testimony on which Wimbley bases this claim occurred during the direct examinations of Ira Roberts and Roberts’s cousin Earnest Lee Barnes. •. ⅛
During his direct examination, Roberts, testified' that he had received a telephone call from his “in-laws” but did not disclose the contents of the telephone call. (R. 678.) The prosecutor then asked Roberts what he had done “as a result of receiving that phone call.” (R. 678.) Roberts said that he called Barnes because Roberts, Barnes, and Crayton worked together and he “was trying to look out for [Barnes].” (R. 678.) Roberts then testified that his in-laws had “[described a gold car” and he told Roberts that “something bad just happened.” (R. 678.)
On direct examination, Barnes testified that Roberts called him and told Barnes to “get them guys out [sic] your car cause they just done something bad up there in Courtelyou.” (R. 731.) Barnes said, that, after receiving: the telephone call from Roberts, he took Crayton back to his car and Wimbley to the Greyhound bus station. Barnes also testified that, after leaving Wimbley at the Greyhound bus station, Barnes called Roberts, who “said a guy up there shot and killed somebody up there in Courtelyou.” (R. 733.) Following that telephone, call, Barnes went to the McIntosh Police Department, where he gave a statement.
Wimbley raised no objection to any of the testimony about which he complains; therefore, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
Rule 801 (c)¡, Ala. R. Evid., provides: “‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” “ ‘ “[The hearsay rule] does not exclude extrajudicial utterances offered merély to prove the fact of the making or delivery thereof, or to explain subsequent conduct of a hearer.” ’ Ashford v. State, 472 So.2d 717, 719 (Ala.Crim.App.1985), quoting 22A C.J.S. Criminal Law § 718 (1961).” Robitaille v. State, 971 So.2d 43, 57 (Ala.Crim.App.2005). Similarly, the Confrontation “Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.” Crawford v. Washington, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)).
The record demonstrates that none of the statements relayed by Roberts and Barnes was offered to prove the truth of *236 the matter asserted. Rather, they were offered to explain the subsequent conduct of the hearer of the statement, i.e., they were offered to explain why Roberts called Barnes and why Barnes dropped off Cray-ton and Wimbley and went to the police. Accordingly, no error, much less plain error, resulted from the admission of this testimony, and Wimbley is not due any relief on this claim.
IX.
Wimbley also contends that “the prosecutor in [his] trial improperly vouched for the propriety of a death sentence in [his] case” and improperly gave his personal opinion that a sentence of death was appropriate. Wimbley did not object to the prosecutor’s statement; therefore, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
During opening statement of the penalty phase, the prosecutor made the following statement:
“[Defense counsel], ladies and gentlerpen of the jury, I have been a prosecutor since 1994. During that seventeen years, this is the first time that I have ever stood before a jury and asked that jury to do-what I am about to ask you.to do, that is, to recommend a sentence of death to [the circuit judge].”
(R. 1002.)
Immediately after those comments, the prosecutor said:
“Now, that is something I realize the magnitude of. I know that is a difficult decision. It is the most difficult decision that .any citizen who’s ever served on jury duty will ever have to make. And I’ve seen the look on some of your faces this week. I know some of you are stressed about it. And I know some of you have a heavy burden about it. And I know that you’re struggling, some of you are, and I realize that.” -
(R. 1002-03.) According to Wimbley,- in those statements, the prosecutor gave his pérsonal opinion that a death sentence was proper.
This Court rejected a similar argument in Vanpett v. State, 74 So.3d 32 (Ala.Crim.App.2009). In that case, the prosecutor told the jury in the penalty phase:
“ ‘Ladies and gentlemen, if this case does not call for the death penalty, what does? .,.
“ ‘After you weigh it out, I ask you to return a l’ecommendation, an advisory opinion for a verdict of the death penalty '•in this case because this-case calls for the death penalty.' If there has ever been one that does, this case right here calls for it.’ ’’
Mat91.
The prosecutor in Vanpett had also said:
“T know that you understand the awesome responsibility that has been placed on your shoulders and your duty is very difficult. I want you to know that it is not easy and not without a lot of soul searching by the State of Alabama that we have come to you and ask •you to make such an awesome decision. It is a difficult decision, but the law and the facts of this case — the judge is going to give you the law in just a few minutes — but they are there to guide you, to guide you to the correct recommendation.’”
Id. Rejecting the same argument Wimbley makes, this Court held:
“In our adversarial- system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate. See Hall v. State,- 820 So.2d 113, 143 (Ala.Crim.App.1999). On the other hand, it is impermissible for a prosecu *237 tor to urge the jury to ignore its penalty-phase role and simply rely on the fact that .the State has already determined that death is .the appropriate sentence. See Guthrie [v. State, 616 So.2d 914, 931-32 (Ala.Crim.App.1993) ] (holding that a prosecutor’s statement that “ ‘[w]hen I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this was a death penalty case, and we still stand on that position’ ” improperly ‘[led] the jury to believe that the whole governmental establishment had already determined that the sentence should be death and [invited] the jury to adopt the conclusion of others, ostensibly more qualified' to make the determination, rather than deciding bn its own’).
“When 'the prosecutor’s comments are viewed in context, it is clear that he was properly argüing in favor of a sentencé of death and properly reminding the jury of the gravity of its penalty-phase role. For instance, in stating that, ‘if this case does not call for the death penalty, what does,’ the prosecutor was properly arguing that a death sentence is appropriate and appealing to the jury to do justice. See Hall, 820 So.2d at 143. Also, the prosecutor’s comment that his office does not seek a death sentence lightly was not an improper request for the jury to ignore its penalty-phase duty. Instead, this comment merely reminded the jury of the gravity of its penalty-phase decision by informing the jury that in making its penalty phase decision it has an awesome responsibility — one that the State does not lightly ask a jury to shoulder. Cf. Fox v. Ward, 200 F.3d 1286, 1300 (10th Cir.2000) (holding that a ‘prosecutor[’s] [comment to] the jury that he did not undertake'the decision to seek the- death penalty lightly, and pointed to the different elements that went into making his decision[, was] a permissible line of com.mentary’).”
Vanpelt, 74 So.3d at 91-92.
The comments in the instant case are very similar to .the comments made in Vcmpelt. Similarly, it is clear that.the prosecutor was not giving a personal opinion regarding the death sentence or vouching for a sentence of death. Rather, the prosecutor was properly arguing in favor of 'a sentence of death and properly reminding the jury of the gravity of its penalty-phase role. Therefore, this Court finds no error, plain or otherwise, in the prosecutor’s comments. Rule 45A, Ala. R.Crim. P.-
X.
. Wimbley next argues that he “is entitled to a new sentencing proceeding because the trial court failed to consider uncontro-verted mitigating evidence.” (Wimbley’s brief, at 86.) Wimbley specifically asserts that the circuit court considered neither his “particularly difficult childhood” nor “his family’s love and affection for him.”. (Wimbley’s brief, at 89-90.) Wimbley’s argument appears to be based solely on the fact that the circuit court’s sentencing order does not list those alleged mitigating circumstances as circumstances that the circuit court weighed in sentencing him to death.
It is well settled that “‘[a] sentencer in a capital case may not refuse to consider or be “precluded from considering” mitigating factors.’ ” Lewis v. State, 24 So.3d 480, 530 (Ala.Crim.App.2006) (quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), quoting in turn Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), quoting in turn Lockett v. Ohio, 438 U.S. *238 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).
‘“It is not required that the evidence submitted by the accused as a nonstatu-tory mitigating circumstance ' be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.’ ”
Ex parte Land, 678 So.2d 224, 241 (Ala.1996) (quoting Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.1991)). See also Gavin v. State, 891 So.2d 907, 990 (Ala.Crim.App.2003) (“Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.” (citations and quotation marks omitted)). Further, it is “settled law that ‘the triah court is not réqdired to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.’ Ex parte Ferguson, 814 So.2d 970, 979 (Ala.2001). (quoting Williams v. State, 710 So.2d at 1347). See also McWhorter v. State, 781 So.2d 257, 309 (Ala.Crim.App.1999) (“Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating: Further, the decision as to whether a particular mitigating circumstance is sufficiently proven by the evidence and the weight to be accorded to it rests with the .trial court.” (citations and quotation marks omitted)).
Neither the record nor the . circuit court’s sentencing order supports Wim-bley’s argument that the circuit court failed to consider mitigating circumstances. Instead, the circuit court did not restrict Wimbley’s presentation of evidence in mitigation and considered all the evidence Wimbley presented. After finding that two statutory mitigating circumstances existed, the circuit court stated that it had “considered all of the non-statutory mitigating evidence presented by the defendant....” (C. 374.). It then detailed the circumstances that it found to be mitigating. Id. It is clear that the circuit court considered all the mitigating circumstances presented to it. Williams v. State, 710 So.2d at 1347 (“[T]he trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.”) (citing Morrison v. State, 500 So.2d.36 (Ala.Crim.App.1985)).
Because the circuit court clearly considered all mitigating circumstances presented to it, this Court finds that no error occurred. See Reeves v. State, 807 So.2d 18, 48-49 (Ala.Crim.App.2000) (holding that the circuit court “fully complied with Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny”, where “[t]he sentencing order in £h[at] case show[ed] that the trial court considered all of the mitigating evidence offered by the appellant”). Therefore, Wimbley is not entitled to relief as to this claim.
XI.
Wimbley next contends that the prosecutor improperly argued that the jury should recommend a sentence of death to punish Wimbley’s family. According to Wimbley, during penalty-phase. rebuttal *239 argument the prosecutor “asserted that Mr. Wimbley’s family should have to suffer the same way the victim’s'family suffered.” (Wimbley’s brief, at 94.) Wimbley did not raise this argument below; therefore, this Court’s review is limited tó plain error only. Rule 45A, Ala. R.App. P.
During Wimbley’s closing argument, his attorney stated:
“But I submit to you that a recommendation for life imprisonment without the possibility of parole would be a severe punishment in this case. He will be locked in a cell for the rest of his life¡ He won’t be there for family reunions. He won’t be there for births of family members. He won’t be there for death of family members. He will be in a cell the rest of his life. But when those events are occurring, he will be there realizing I’m not there because of me.”
(R. 1083.)
The prosecutor responded to defense counsel’s suggestion that Wimbley will be isolated from his family as follows: . .
“Ladies and gentlemen, [life -in prison without the possibility of parole] might be punishment for the defendant, but his mother, his brother and his family members, they can go down there to the prison and visit with him. Those two folks right there can’t visit their brother any more. Those days are over. Won’t be any more holidays shared with him, even if he is in prison, because he’s gone, and he’s gone because of that man right there.”
(R. 1083-84.)
This Court has held:
“It is well settled that ‘[a] prosecutor has the right to “reply in kind” to statements made by defense counsel in the defense’s closing argument.’ Newton v. State, [78 So.3d 458, 478] (Ala.Crim.App.2009) (citations and quotations omitted). ‘“When the door is opened by defense counsel’s argument, it swings wide, and ■"& number of areas barred to prosecutorial comment will suddenly be subject to reply.” ’ Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986) (quoting DeF- - oor, Prosecutorial Misconduct in Closr ing Argument, 7 Nova L.J. 443, 469-70 (1982-83)).”
Vanpelt, 74 So.3d at 82.
The record demonstrates that the prosecutor’s statement was a reply to arguments made by defense counsel. As such, no error, much less plain error, occurred. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Wimbley to any relief.
XII.
Wimbley next argues that the prosecutor- improperly made certain statements regarding Wimbley’s age. He specifically cqmplains that “[t]he prosecutor asked all of the jurors to affirm during voir dire that' a young person is just as culpable as an older, person.... Then, in closing, arguments, the prosecutor held the- jurors to their commitment not to consider Mr. Wimbley’s age.” (Wimbley’s brief, at 96-97.)
Wimbley did not object to the prosecutor’s voir dire questions or his penalty-phase rebuttal argument; therefore, this Coqrt reviews this claim for plain error only. See Rule 45A, Ala. R.App. P.
A.
Prior to trial, Wimbley filed a “Defendant’s Notice of Mitigating Circumstances.” (C. 324.) In that notice, Wim-bley -notified the State that one of the mitigating circumstances in his case was his “youthfulness and immature mental age:” (C. 324.) During the voir dire examination of the venire, the prosecutor *240 asked whether the potential jurors “believe[d] that a twenty-two year old man should be treated differently under the law than someone who’s forty-two years of age.” (R. 199.)
As Wimbley correctly notes in his brief, defense counsel at his trial “argued that his age was an important mitigating factor.” (Wimbley’s brief, at 96.) The record indicates that, in the penalty-phase closing argument, defense counsel stated that “[a] second mitigating factor is his age, twenty-one years old at the time this occurred. Young man, as I said earlier,' in the prime of his life, twenty-one years of age.” (R. 1080.) During the penalty-phase rebuttal argument, the prosecutor argued:
“He tells you that you should take into account his age, the age of this defendant. I asked every one of you in voir dire if you felt a twenty-one, twenty-two year old man should be treated any differently under the law than someone who’s forty-two or sixty-two. All of you indicated to me that shouldn’t 'make a difference. That shouldn’t make a difference. He’s just as responsible for his actions that anyone else should be.”
(R. 1084.)
It is well settled that the “State is not required to agree with the defendant that the evidence offered during the penalty phase is sufficiently mitigating to preclude imposition of the death sentence[, and] the State is free to argue that the evidence is not mitigating at all.” State v. Storey, 40 S.W.3d 898, 910-11 (Mo.2001). Thus, “‘[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant.’ ” Vanpelt, 74 So.3d at 90 (quoting Malicoat v. Mullin, 426 F.3d 1241, 1257 (10th Cir.2005)). That is, “the prosecutor, as an advocate, may argue to the jury that it should give the defendant’s mitigating evidence little or no weight.” Mitchell v. State, 84 So.3d 968, 1001 (Ala.Crim.App.2010) (citing Storey, 40 S.W.3d at 910-11).
Here, the prosecutor merely argued that the jury should not give any mitigating weight to Wimbley’s age at the time of the offense. Those comments are appropriate in “our. adversarial system of criminal justice, [where a] prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate.” Vanpelt, 74 So.3d at 91. Consequently, Wimbley has not shown that any error, much less plain error, resulted from the prosecutor’s statement. Rule 45A, Ala.'R.App. P.
B.
Wimbley also contends that “the prosecutor tried to elicit commitments from members of the venire to vote for a death sentence.” (Wimbley’s brief, 'at'98.) Specifically, Wimbley argues that the prosecutor relayed the facts of his crime to the members of the venire and then asked, in various ways, whether the venire felt that those facts were serious enough to impose the death penalty. According to Wimbley, the prosecutor’s questions were designed to elicit a commitment from the venire to vote for a death sentence.
The Alabama Supreme Court has stated:
“A party may not solicit a promise to return a particular verdict. Ex parte Dobard, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). In asking this question, the prosecutor was not asking for a commitment or promise from the prospective jurors to vote for the death penalty. He was merely attempting to determine if any of the potential jurors were of a mind-set that would affect their verdict as tending to show bias or interest. The parties have a right, with *241 in the sound discretion of the trial court, to- do this. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981). Furthermore, questions concerning., jurors’ attitudes about capital punishment are not limited to those questions that would elicit information constituting grounds of a challenge for cause. Brown v. State, 288 Ala. 684, 264 So.2d 553 (1972); Arthur v. State, 472 So.2d 650 (Ala.Crim.App.1984); rev’d on other grounds, 472 So.2d 665 (Ala.1985).”
Ex parte Ford, 515 So.2d 48, 52 (Ala.1987).
The record demonstrates that the prosecutor was not seeking to elicit commitments from the veniremembers to recommend a sentence of death. Rather, the prosecutor was “attempting to determine if any of the potential jurors were of a mindset that would affect their verdict- as -tending to show bias or interest.” Id. Accordingly, there was no error, much less plain error, and this issue does not entitle Wim-bley to any relief.-
XIII.
Wimbley next argues that the circuit court erroneously found that the murder was especially heinous, atrocious, or cruel when compared to other capital offerises. § 13A-5-49(8), Ala.Code 1975. According to Wimbley, the circuit court erroneously “emphasized that the offense was especially heinous, atrocious or cruel because Mr. Wheat could have been in pain for ‘hours’ after being shot.” (Wimbley’s brief, at 100.) Wimbley states that the evidence does not show that Wheat lived for hours. He also argues that the circuit court erroneously found that Wheat suffered psychologically. Specifically, Wimbley argues that the evidence showed that “Mr. Wheat was likely aware of his impending death for less than a minute, not an appreciable lapse of time.” . (Wimbley’s brief, at 102.) Thus, Wimbley concludes that the- circuit court erroneously found that Wheat suffered physically or psychologically for an appreciable length of time causing prolonged suffering before his death.
In regard to the this aggravating circumstance, the circuit court found:
“In support of this court’s finding that . - the capital offense was especially heinous,.'atrocious or cruel as compared, to other capital offenses, this Court finds , the following: The victim, Connie Ray Wheat was consciously aware of his ulti- . -mate demise and suffering. Testimony received from Dr. Krolikowski, Patholo- ¡..- gist with the .Alabama-Department of Forensic Science, established that if the victim was shot in the right arm first, then he would have suffered pain, and that he could have survived for seconds -.to hours.. This court finds that the victim was in fact shot in the right arm .first based .on the Defendant’s confession. In said confession, the Defendant stated that after he told the victim that this was a ‘stick- up’, he then shot him in the right-arm at close range. Based on . the Defendant’s confession and the testimony of the pathologist, this Court finds , that the victim was consciously aware of his ultimate demise and that he suffered . substantial pain before. his untimely - death at the hands of the Defendant.
“The victim was not shot only once. ., He was shot a total of three (3) times, including once in the back. This evidenced displayed a conscienceless and pitiless act toward the victim. . After the Defendant shot’ and killed an innocent man, the evidence established that he then proceeded to pour gasoline on the , victim and .throughout the store in an attempt to burn the crime scene. The court finds that the act of pouring gasoline on the victim after rendering him helpless due .to multiple gunshot wounds .was an act of utter disregard for the *242 sanctity of innocent human' life. ‘Such acts by the defendant evidenced' extremely wicked and shockingly- evil -action unaccustomed to this Court.- ' ■ ■
“Furthermore, this Court'also finds that this crime was premeditated, evi-deneinga cold calculated design to kill. The evidence introduced at trial established -that the victim worked- alone and that-his store was not'equipped with video surveillance or a security guard. The-' Defendant’s confession established that he mixed the gasoline-before he" left his mother’s house in Sunflower, Alabama. The evidence introduced at trial also established that when the- Defendant entered Harris Grocery on December 19, 2008, he was equipped with a pistol, soda bottle containing a gasoline mixture and a box of matches. This court 'finds that the evidence at trial established that the Defendant planned to rob, murder and bürn Ray. Wheat and the crime scene'. It is the opinion of this Court that the Defendant had-a premeditated plan, which evidenced a cold- calculated design to kill. This kind of hatred and callous disregard for human life is something this Court is not accustomed to and wishes 'to never encounter again. Further, the facts as stated above support a finding that this crime was especially heinous, atrocious or cruel as compared to other capital offenses. As a result, this aggravating factor weighs heavily in favor of following the jury’s recommended verdict of death.”
(C. 371-72.)
 The especially heinous, atrocious, or cruel aggravating circumstance “applies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981) (citing State v. Dixon, 283 So.2d 1 (Fla.1973)), abrogated on' other grounds by Ex parte Stephens, 982 So.2d 1148, 1152-53 (Ala.2006).
“ ‘There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or eruel: ■ (1) the infliction on the'victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and' (3) the infliction -of psychological torture on the victim.’
Saunders v. State, 10 So.3d 53, 108 (Ala.Crim.App.2007) (quoting Brooks v. State, 973 So.2d 380, 417-18 (Ala.Crim.App.2007), citing in turn Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999)).
Under the first two factors, “(1) the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and (2) the victim must be conscious or -aware when at least some of the additional or repeated violence is inflicted.” Norris, 793 So.2d at 854. This Court has held that “[w]hen a defendant deliberately shoots a victim in the head in a calculated .fashion, after the victim has already been rendered helpless by [prior] gunshots ..., such ‘extremely,wicked or shockingly evil’ action may be characterized as. especially heinous, atrocious, or cruel.” Hardy v. State, 804 So.2d 247, 288 (Ala.Crim.App.1999) (citations and quotation marks omitted).
Further, “[psychological torture [under the third factor] can be inflicted by leaving the victim in'- his last moments aware of, bút helpless.to prevent, impending death.” Norris, 793 So.2d at 859-60 (citations and quotation marks omitted). “[T]he factor -of psychological torture must have been -present for an appreciable lapse of time, sufficient enough to have caused prolonged or appreciable suffering, i.e., the period of suffering must *243 be prolonged enough to separate the crime from ‘ordinary murders for which the death penalty is not appropriate.” Id. at 861 (holding that the murder of three individuals was not psychologically torturous because the three victims were- shot in rapid succession; the “first three shots were sudden, without any warning or precipitating event[, and] [t]here was nothing preceding the first murder that would have evoked in the victims intense apprehension, fear, or anticipation of their deaths”').
Iii Hardy, 804 So.2d at 287-88, this Court held that a similar murder of a store clerk was especially heinous, atrocious, or cruel when compared to other capital offenses. See also Sneed v. State, 1 So.3d 104, 119 (Ala.Crim.App.2007). Rejecting Hardy’s argument that thé circuit court erroneously found that his- crime was especially heinous, atrocious, or cruel when compared to other capital offenses, this Court held:
“Hardy contends ‘that the trial court’s finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses was erroneous ‘for a number of reasons.’ See § 13A-5-49(8)[, Ala.Code 1975]. The only grounds asserted, however, are that the prosecution did not ‘properly’ prove this aggravating circumstance and that the facts of this crime, when compared to those cases in which we have, held that the circumstance was supported, by the evidence, do not separate this crime from other capital murders.
“The trial court made the following pertinent findings:
“‘The court finds the State has proven beyond a reasonable doubt the offense.was especially heinous, atrocious, and cruel.. This crime is • set apart-from other-capital cases in that the crime was a conscienceless and pitiless crime and was unnecessarily torturous to the victim. The defendant shot and killed Clarence Nugene Terry. When the first shot was fired, the victim ran behind the counter and attempted to hide, rolling-himself into a ball;- however, the defendant leaned - over the counter and shot the victim in'the chest. After doing so, the defendant then- stood over the victim and shot him in the head at least five more times while the victim lay unarmed and helpless on the floor. Further, the victim ■ did not die immediately after the first shot, but lived for at least fifteen (15) seconds while the defendant continued to fire shots into his head. Therefore, the aggravating circumstance specified in Section 13A-5-49(8), Code of Alabama, does exist and is considered by the court in de-términing the appropriate sentence to impose in this Case.’
“(C.R.30-31.)
•“We find that the trial court’s findings are fully supported by the record, and we concur in them.
“ ‘The evidence in this case clearly supports the trial court’s finding that this capital offense was especially heinous, atrocious, and cruel. The appellant shot the victim in the wrist and then shot thé victim in the head after she had fallen to the ground. “When a defendant deliberately' shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by [prior] gunshots ..., such ‘extremely wicked or shockingly evil’ action may be characterized as especially heinous; atrocious, or cruel.” Lawhorn v. State, 581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). See also McWilliams v. State, 640 So.2d 982 (Aa.Crim.App. *244 1991), aff'd in part remanded in part on other grounds [640 So.2d 1015 (Ala.1993), aff'd after remand, 666 So.2d 89 (Ala.Crim.App.1994), aff'd, 666 So.2d 90 (Ala.1995)]. Bush v. State, 431 So.2d 555 (Ala.Crim.App.1982), aff'd, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Further, “[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990)." White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).’
“Rieber v. State, 663 So.2d 985, 993 (Ala.Crim.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). See also Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). Finally, we note that the prosecution’s evidence met the burden set out in Ex parte Clark, 728 So.2d 1126 (Ala.1998): the victim was in fact conscious and aware during most of the ordeal.”
Hardy, 804 So.2d at 287-88.
Similarly, in this case the State presented evidence from which the circuit court could have reasonably inferred that Wheat’s murder was especially heinous, .atrocious, or cruel when compared to other capital offenses. The State’s evidence indicated that Wimbley went into the store with a pistol and a bottle containing a mixture, of gasoline and soft drink that he intended to use to burn the crime scene. According to Wimbley’s statement, he walked up to the counter and asked Wheat to give him change for a dollar. Thereafter, Wimbley pointed the pistol at Wheat and told him “it was a stick up.” (C. 545.) Wimbley stated that his memory of the event was unclear but that, when Wimbley “said just give me the money,” WTieat appeared to try to defend . himself. ,(C. 546.) Wimbley then shot Wheat in the arm. Both Wimbley’s statement and the stippling on "Wheat's arm establish, that Wimbley shot Wheat in the arm at close range. Further, Dr. Krolikowski testified that Wheat would have been conscious after the gunshot wound to his arm and that it would have been painful.
After the first shot to the arm, Wimbley shot Wheat in the chest and in the back. Neither of those two wounds had stippling, indicating that Wheat was attempting to move away from Wimbley. Further, those two wounds were on opposite sides of .Wheat’s body — 'the front and the back — ■ indicating that Wheat was alive and moving.
From this evidence, the circuit court could have reasonably inferred that Wheat knew his life was in danger and sought to defend himself. ' At that point, Wimbley removed any doubt Wheat may have had regarding Wimbley’s intent to kill when Wimbley shot Wheat point blank in the 'arm causing excruciating pain. Then, as Wheat struggled to escape, Wimbley shot him- in the chest and in the back. From this evidence, the circuit court reasonably found that Wheat was well aware that his death was imminent. The circuit court also reasonably found that Wimbley’s assault caused more pain than necessary to cause Wheat’s death. Hardy, 804 So.2d at 287-88. Accordingly, the circuit court did not abuse its discretion by finding that *245 Wheat appreciably suffered both physical pain and psychological torture; therefore, the heinous, atrocious, or cruel aggravating circumstance applied.
XIV.
Wimbley next argues that the circuit court erroneously used robbery as an element of the capital offense and as an aggravating circumstance. According to Wimbley, the “use of robbery as aggravation in the first phase and as an aggravating- circumstances [sic] in the penalty phase failed to narrow the class'of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty.” (Wimbley’s brief, at 103) (emphasis in original). Wimbley also asserts that “[t]he use of robbery-murder as an aggravating circumstances [sic] was also error because the act of robbery is so common in homicide cases that it cannot meaningfully distinguish between the small subset of homicide cases that may be death-eligible and the larger group of homicides that are not.” (Wimbley’s brief, at 103-04.)
Rejecting an identical argument, this Court has held:
“Contrary to Vanpelt’s assertions, there is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A-5-45(e), Ala.Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for - purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld'the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007);, Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So,2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily ’.required, Vanpelt is not entitled to any relief on this issue. § 13A-5-45(e), Ala. Code 1975.”
Vanpelt, 74 So.3d at 89.
Similarly, “[b]ecause double counting is constitutionally permitted and statutorily required, [Wimbley] is not entitled to any relief on this issue. § 13A-5-45(e), Ala. Code 1975.” Id.
XV.
Wimbley next argues that his sentence of death violates the holding of the Supreme Court of the United States in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that Ring was violated because the jury did not unanimously determine that the aggravating circumstances outweighed the- mitigating circumstances. Wimbley further argues that the Alabama Supreme Court’s holding Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), should be overruled because: 1) it allows for the imposition of a *246 sentence of death without the jury unanimously finding that the aggravating circumstances outweigh the mitigating circumstances;- 2) it “impermissibly eases the State’s burden of proving that the death penalty is an appropriate punishment by holding that-the jury need not be unaware that- its culpability phase finding alone may authorize the-trial judge to'impose-'the death penalty in certain-cases”; and 3) it “undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.” (Wimbley’s brief, at 107-08.) -
Rejecting identical arguments, this Court has held:
“Woolf contends that Ring v. Arizona, 536 U.S. 584 (2002) ‘invalidates critical aspects of Alabama’s capital sentencing scheme and renders his death sentence .unconstitutional.’ (Woolfs b£lef, p. 106.) Specifically, while acknowledging the Alabama Supreme Court’s : decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), Woolf: (1) ‘disagrees with Wal-drop’s holding that the Sixth Amendment does not require a jury to unanimously conclude that the aggravating circumstances outweigh' the mitigating circumstances because the weighing process is a “moral” judgment rather than a determination requiring a quantum of proof; (2) argues that Waldrop imper-missibly cases the State’s burden of proving that the death penalty is an appropriate punishment by holding that the jury need not be unaware that its culpability phasé finding alone may authorize the trial judge to' impose -the death penalty in certain cases;’ and (3) argues that the Waldrop decision ‘undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.’ (Woolfs brief, pp. 106-OS.)
“In Waldrop, the Alabama Supreme Court explained:
“ ‘Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed,2d 435 (2000),] do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in “an increase in a defendant’s authorized punishment ...” or “ ‘expose[ ], [a defendant] to a greater pun-ishment_’” Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance-in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this -case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became “exposed” to, or eligible for, the death penalty. The trial court’s subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier, is not an “element” of the offense.’- -
“Waldrop, 859 So.2d at 1190.
“Although Woolf may disagree, with Waldrop, ‘ “[t]his Court has no authority to overrule Alabama Supreme Court precedent.”’ Lane v. State, 169 So.3d 1076, 1135 (Ala.Crim.App.2013) (quoting Whatley v. State, [146 So.3d 437, 489] (Ala.Crim.App.2010) (opinion on return to remand)).”
*247 Woolf v. State, [Ms. CR-10-1082, May 2, 2014] — S6.3d —, — (Ala.Crim.App.2014).
As in Woolf, Wimbley’s arguments have been foreclosed by the Alabama Supreme Court’s decision in Wal-dróp, and this Court has no authority to overrule that decision. Therefore, this issue does riot entitle Wimbley to any relief.
XVI.
Wimbley next argues that the circuit court erroneously allowed the jury to be death-qualified, thus resulting in a conviction-prone jury in violation of his right, to an impartial jury.
This Court has repeatedly rejected this argument. For instance, in Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993), this Court-held:
“In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from ‘death qualification’ of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).”
Sockwell, 675 So.2d at 18; see also Revis v. State, 101 So.3d 247, 310-11 (Ala.Crim.App.2011) (same); McCray v. State, 88 So.3d 1, 76 (Ala.Crim.App.2010) (same); Vanpelt, 74 So.3d at 50 (same).
Because- the Constitution does not prohibit death-qualification of the - jury in a capital-murder trial, the circuit court committed no error in allowing the prospective jurors to be: questioned about their views of capital punishment. Accordingly, this issue does not entitle Wimbley to any relief:
XVII.
^'Wimbley next argues that the circuit court’s and the prosecutor’s repeated references to the jury’s verdict as advisory or 'as a recommendation misled the jury and improperly diminished the-jury’s sense of responsibility for its sentencing determination in violation of Darden v. Wainwright, 477 U.S. 168, 183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, this issue has been addressed previously and decided adversely to Wimbley.
In Albarran v. State, 96 So.3d 131 (Ala.Crim.App.2011), this Court wrote:
“First, the circuit court did not misinform the jury that its ’ penalty phase • verdict is a recommendation. ' Under § 13A-5-46, Ala.Code "1975, the jury’s "role in the penalty phase of a capital case is to render an advisory verdict ■ recommending a sentence to the' circuit judge. It is the circuit judge who ultimately decides the capital defendant’s sentence, and, ‘[w]hile the jury’s recommendation concerning sentencing shall *be given consideration, it is not binding upon the courts.’ § 13A-5-47, Ala.Code , 1975. Accordingly, the circuit court did not misinform the jury regarding its role in'the penalty phase.
“Further, Alabama courts have repeatedly held that ‘the comments of the prosecutor and'the'instructions of the trial court accurately informing a jury of . the extent of its sentencing - authority and that its sentence verdict was “advi.sory” and a “recommendation” and that ' the trial court would-make the final decision -as to sentence . does not violate o Caldwell v. Mississippi [, 472 U.S. 320 *248 (1985)].’ Kuenzel v. State, 577 So.2d 474, 502 (Ala.Crim.App.1990) (quoting Martin v. State, 548 So.2d 488, 494 (Ala.Crim.App.1988)). See also Ex parte Hays, 518 So.2d 768, 777 (Ala.1986); White v. State, 587 So.2d 1218 (Ala.Crim.App.1990); Williams v. State, 601 So.2d 1062, 1082 (Ala.Crim.App.1991); Deardorff v. State, 6 So.3d 1205, 1233 (Ala.Crim.App.2004); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007). Such comments, without more, do not minimize the jury’s role and responsibility in sentencing and do not violate the' United States Supreme Court’s holding in Caldwell. Therefore, the circuit court did 'riot err by informing the jury that its penalty-phase verdict was a recommendation.”
96 So.3d at 210. Because “ ‘[t]he prosecutor’s comments and the trial court’s instructions “accurately informed the jury of its sentencing authority and in no way minimized the jury’s role and responsibility in sentencing,” ’ ” Hagood v. State, 777 So.2d 162, 203 (Ala.Crim.App.1998) (quoting Weaver v. State, 678 So.2d 260, 283 (Ala.Crim.App.1995)), aff'd in part, rev’d in part on unrelated grounds, Ex parte Hagood, 777 So.2d 214 (Ala.1999), Wimbley is not entitled to any.relief as to this claim.
XVIII.'
Wimbley next argues that Alabama’s method of execution — lethal injection — is cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution.
This Court notes that Wimbley’s entire argument as to this issue consists of one paragraph and completely fails to offer any argument regarding why he believes lethal injection is unconstitutional. Rather, Wimbley, in cursory fashion, declares that lethal injection in Alabama has not heen found to comply with the standards established by the Supreme Court of the United States in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); therefore, his sentence of death constitutes cruel and unusual punishment in violation of the Eight and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and 'Alabama law. Wimbley’s argument fails to’ take into account the fact that he bears the burden of establishing that lethal injection constitutes cruel and unusual punishment. See Harris v. Wright, 93 F.3d 581, 583 (9th Cir.1996) (recognizing that the appellant bears a heavy burden of establishing that his sentence is cruel' and unusual); cf. United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir.2006) (explaining that the appellant bears, the burden of establishing that his sentence in disproportionate); Cole v. State, 721 So.2d 255, 260 (Ala.Crim.App.1998) (recognizing that the appellant has the burden of establishing that a State statute is unconstitutional); Holmes v. Concord Fire Dist., 625 So.2d 811, 812 (Ala.Civ.App.1993) (“The party mounting a constitutional challenge to a statute bears the burden of overcoming a presumption of constitutionality.”). Because Wimbley bears the burden of establishing that lethal injection is unconstitutional, his argument that lethal injection is unconstitutional until a court determines otherwise is without merit.
Moreover, this Court, in Saunders v. State, held that “lethal injection does not constitute per se cruel and unusual punishment. See e.g., ’ McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein.” 10 So.3d 53, 111 (Ala.Crim.App.2007). Further, both the Supreme Court of the-United States and the Alabama Supreme Court have held that lethal injection does not constitute cruel and unusual punishment. Baze, 553 U.S. at 54-56 (holding that lethal injection does not *249 violate the Eighth Amendment); Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008) (holding that lethal injection is- not unconstitutional). Wimbley has not offered this Court any basis upon which to hold thát lethal injection is unconstitutional.
Because Wimbley’s claim has been rejected by the Supreme Court of the United States, the Alabama Supreme Court, and this Court and because he has not offered this Court any reason to revisit the issue, he is not entitled to any relief.
XIX.
Wimbley further argues that the cumulative effect of the errors requires that; He be granted a new trial or a new sentencing proceeding.
The Alabama Supreme Court has explained:
“ ‘[Wjhile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then” the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.).”
Brownfield v. State, 44 So.3d 1, 33 (Ala.Crim.App.2007).
Applying the standard set forth in Ex parte Woods, 789 So.2d 941 (Ala.2001), this Court has reviewed the alleged erroA Wimbley has raised on appeal and has scrupulously searched the record for-: err rors not raised on appeal. Rule 45A, Ala. R.App. P. After a thorough review of.the record, this Court is convinced that, individually or cumulatively, no error or errors occurred that would entitle Wimbley to relief. -
XX..
Pursuant to § 13A-5-53, Ala. Code 1975, this Court is required to address the propriety of Wimbley’s conviction and sentence of death. Wimbley was indicted for and convicted of one count of murder made capital because it was committed during the course of a robbery, see f 13A-5-40(a)(2), Ala.Code 1975, and one count of murder, made capital because it was committed during the course of an arson, see ‘ § 13A-5-40(a)(9), Ala.Code 1975.
The record does not demonstrate that Wimbley’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the circuit court stated that it found two aggravating circumstances: 1) that Wimbley committed the capital offense while he-was engaged in the commission of a robbery, see § 13A-5-49(4), Ala. Code 1975; and 2) that the capital offense was especially heinous, atrocious, or cruel compared to- other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The circuit court then considered each, of the statutory mitigating circumstances .and found that two statutory mitigating, circumstances were applicable: 1) - Wimbley’s lack of. a significant criminal history; and 2) Wim-bley’s age at the time of the offense. As this Court noted in Part X of this opinion, the ‘ circuit court also considered all the nonstatutory mitigating evidence Wimbley presented, including: 1) Wimbley’s care of his stepchildren; 2) his lack of knowledge of and involvement with guns; 3) his involvement in church activities; and 4) Wimbley “was a good, quiet child.” (C. 374.) The circuit court’s sentehcing order *250 shows that it properly weighed the aggravating and mitigating circumstances and correctly sentenced Wimbley to death. The record supports the circuit court’s findings.
Section 13Ar5-53(b)(2), Ala.Code‘1975, requires this Court to reweigh the aggravating and mitigating circumstances in order to determine whether Wimbley’s death sentence is proper. After independently weighing thq aggravating and mitigating circumstances, this Court finds that Wim-bley’s sentence of death is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must now determine whether Wimbley’s sentence is excessive or disproportionate when compared to the penalty imposed in similar cases.' In this case, Wimbley was convicted of murder during a robbery. Sentences of death have been imposed for similar crimes in Alabama. See Riley v. State, 166 So.3d 705 (Ala.Crim.App.2013); Byrd v. State, 78 So.3d 445 (Ala.Crim.App.2009); Melson v. State, 775 So.2d 857, 863 (Ala.Crim.App.1999); and Washington v. State, 922 So.2d 145 (Ala.Crim.App.2005). Wimbley was also convicted of murder during an arson. Sentences of death have been imposed for similar crimes in Alabama. See Scott v. State, 163 So.3d 389 (Ala.Crim.App.2012); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994) Therefore, this Court holds that Wimbley’s death sentence is neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely ■ affected Wimbley’s substantial rights and .has found nope.. See Rule.45A, Ala. R.App. P. , - . . ..
Accordingly, Wimbley’s conviction and sentence of death are affirmed.
AFFIRMED.
WINDOM, P.J., concurs. KELLUM, J., concurs in part and concurs in the result, with opinion. BURKE, J., concurs in thé result. WELCH and JOINER, JJ., dissent, with opinions.

. Testimony demonstrated that Harris Grocery was located at the intersection of Courte- • lyou Road and United States' Highway 43.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed,2d 694 (1966).

. State’s exhibit 56 is the video recording of Wimbley’s statement. A transcript of the statement was also admitted. The transcript of the statement contains numerous notations indicating that what was said was inaudible.

. On the transcript of the interview, Deputy Grimes’s first name is spelled' Ferrill. The actual spelling is Ferrellt

. The transcript, of this portion of Wimbley’s statement reads as follows:
“Yes, Sir. (Inaudible) they said I was, I was a threat to, to the population but I’m not no threat. I (Inaudible) I’ll sleep oh the floor, it’s dark in there, the water don’t work, (Inaudible) population.”
(C. 553.) Relying on the transcript only, Wim-bley argues that he asked to speak with law-enforcement officers about only the conditions of his confinement and not the allegations against him. The actual video recording of Wimbley’s statement, however, belies his argument on appeal.

. Wimbley does not argue that his waiver of his Miranda rights was unknowing or unintelligent, i.e., that he did not have "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.” Spring, 479 U.S. at 573. *204 Rather, he argues only that his waiver was involuntary.

. Wimbley’s brother’s name is Thomas.

. Wimbley’s statement was taken 5 days before his 22nd birthday.

. Deputy Grimes did not indicate that Wim-bley would be moved to general population until after Wimbley waived > his Miranda rights.

. The record indicates that some attorneys in private practice serve as part-time assistant district attorneys. For- the purposes of our resolution of this issue, this Court will refer to those individuals as "assistant district attorneys.”

. As this Court noted above, Wimbley asserts in his brief that “[a]t least ten veniremembers knew Ferrell Grimes," but specifies, and makes an argument as to, only R.G. (Wim-ttey’s brief, at 48.)

. As Wimbley points out in his brief, during voir dire M.S. said that he worked with Cray-ton’s mother and that "she goes with one of [M.S.’s] brother-in-laws [sic].” (R. 455.) Because the prosecutor said that M.S. "had worked with Juan Crayton’s mother or maybe he had dated Juan Crayton’s mother,” there is no meaningful distinction between the statements of M.S. and the prosecutor. (R. 582) (emphasis added.)

. During voir dire S.G, told the circuit court that Wimbley’s father was the brother of her aunt.

. Although Wimbley argues that Sharee Wells, a forensic scientist employed by the Alabama Department of Forensic Sciences, offered an opinion regarding the presence of gasoline on Wimbley’s hands, Wells actually testified that tests conducted on swabs taken from Wimbley’s hands ”show[ed] that no ignitable liquid residue were detected.” (R. 858.) .Indeed, when speaking of Wells during guilt-phase closing argument, defense counsel argued that "the three things they had to test from Corey Wimbley came back with no ignitable residue; , that being a swab of his hands.” (R. 944-45.) .'

. The Alabama Supreme Court amended Rule 702, Ala. R. Evid.; the amendment became effective January 1, 2012.